(Slip Opinion)　　　　OCTOBER TERM, 2009　　　　1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MONSANTO CO. ET AL. *v.* GEERTSON SEED FARMS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 09–475.　Argued April 27, 2010—Decided June 21, 2010

The Plant Protection Act (PPA) provides that the Secretary of the Department of Agriculture may issue regulations "to prevent the introduction of plant pests into the United States or the dissemination of plant pests within the United States." 7 U. S. C. §7711(a). Pursuant to that grant of authority, the Animal and Plant Health Inspection Service (APHIS) promulgated regulations that presume genetically engineered plants to be "plant pests"—and thus "regulated articles" under the PPA—until APHIS determines otherwise. However, any person may petition APHIS for a determination that a regulated article does not present a plant pest risk and therefore should not be subject to the applicable regulations. APHIS may grant such a petition in whole or in part.

In determining whether to grant nonregulated status to a genetically engineered plant variety, APHIS must comply with the National Environmental Policy Act of 1969 (NEPA), which requires federal agencies "to the fullest extent possible" to prepare a detailed environmental impact statement (EIS) for "every . . . major Federal actio[n] significantly affecting the quality of the human environment." 42 U. S. C. §4332(2)(C). The agency need not complete an EIS if it finds, based on a shorter statement known as an environmental assessment (EA), that the proposed action will not have a significant environmental impact.

This case involves a challenge to APHIS's decision to approve the unconditional deregulation of Roundup Ready Alfalfa (RRA), a variety of alfalfa that has been genetically engineered to tolerate the herbicide Roundup. Petitioners are the owner and the licensee of the intellectual property rights to RRA. In response to petitioners'

deregulation request, APHIS prepared a draft EA and solicited public comments on its proposed course of action. Based on its EA and the comments submitted, the agency determined that the introduction of RRA would not have any significant adverse impact on the environment. Accordingly, APHIS decided to deregulate RRA unconditionally and without preparing an EIS. Respondents, conventional alfalfa growers and environmental groups, filed this action challenging that decision on the ground that it violated NEPA and other federal laws. The District Court held, *inter alia,* that APHIS violated NEPA when it deregulated RRA without first completing a detailed EIS. To remedy that violation, the court vacated the agency's decision completely deregulating RRA; enjoined APHIS from deregulating RRA, in whole or in part, pending completion of the EIS; and entered a nationwide permanent injunction prohibiting almost all future planting of RRA during the pendency of the EIS process. Petitioners and the Government appealed, challenging the scope of the relief granted but not disputing that APHIS's deregulation decision violated NEPA. The Ninth Circuit affirmed, concluding, among other things, that the District Court had not abused its discretion in rejecting APHIS's proposed mitigation measures in favor of a broader injunction.

*Held:*

  1. Respondents have standing to seek injunctive relief, and petitioners have standing to seek this Court's review of the Ninth Circuit's judgment affirming the entry of such relief. Pp. 7–14.

      (a) Petitioners have constitutional standing to seek review here. Article III standing requires an injury that is (i) concrete, particularized, and actual or imminent, (ii) fairly traceable to the challenged action, and (iii) redressable by a favorable ruling. See *Horne* v. *Flores*, 557 U. S. ___, ___. Petitioners satisfy all three criteria. Petitioners are injured by their inability to sell or license RRA to prospective customers until APHIS completes the EIS. Because that injury is caused by the very remedial order that petitioners challenge on appeal, it would be redressed by a favorable ruling from this Court. Respondents nevertheless contend that petitioners lack standing because their complained-of injury is independently caused by a part of the District Court's order that petitioners failed to challenge, the vacatur of APHIS's deregulation decision. That argument fails for two independent reasons. First, one of the main disputes between the parties throughout this litigation has been whether the District Court should have adopted APHIS's proposed judgment, which would have *replaced* the vacated deregulation decision with an order expressly authorizing the continued sale and planting of RRA. Accordingly, if the District Court had adopted APHIS's proposed judgment, there would still be authority for the continued sale of RRA notwith-

standing the District Court's vacatur, because there would, in effect, be a new deregulation decision. Second, petitioners in any case have standing to challenge the part of the District Court's order enjoining a partial deregulation. Respondents focus their argument on the part of the judgment that enjoins planting, but the judgment also states that before granting the deregulation petition, even in part, the agency must prepare an EIS. That part of the judgment inflicts an injury not also caused by the vacatur. Pp. 7–11.

(b) Respondents have constitutional standing to seek injunctive relief from the complete deregulation order at issue here. The Court disagrees with petitioners' argument that respondents have failed to show that any of them is likely to suffer a constitutionally cognizable injury absent injunctive relief. The District Court found that respondent farmers had established a reasonable probability that their conventional alfalfa crops would be infected with the engineered Roundup Ready gene if RRA were completely deregulated. A substantial risk of such gene flow injures respondents in several ways that are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis. Moreover, those harms are readily attributable to APHIS's deregulation decision, which gives rise to a significant risk of gene flow to non-genetically-engineered alfalfa varieties. Finally, a judicial order prohibiting the planting or deregulation of all or some genetically engineered alfalfa would redress respondents' injuries by eliminating or minimizing the risk of gene flow to their crops. Pp. 11–14.

2. The District Court abused its discretion in enjoining APHIS from effecting a partial deregulation and in prohibiting the planting of RRA pending the agency's completion of its detailed environmental review. Pp. 14–22.

(a) Because petitioners and the Government do not argue otherwise, the Court assumes without deciding that the District Court acted lawfully in vacating the agency's decision to completely deregulate RRA. The Court therefore addresses only the injunction prohibiting APHIS from deregulating RRA pending completion of the EIS, and the nationwide injunction prohibiting almost all RRA planting during the pendency of the EIS process. P. 14.

(b) Before a court may grant a permanent injunction, the plaintiff must satisfy a four-factor test, demonstrating: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc.* v. *MercExchange, L. L. C.*, 547 U. S. 388, 391. This test fully ap-

plies in NEPA cases. See *Winter* v. *Natural Resources Defense Council, Inc.,* 555 U. S. ___, ___. Thus, the existence of a NEPA violation does not create a presumption that injunctive relief is available and should be granted absent unusual circumstances. Pp. 15–16.

(c) None of the four factors supports the District Court's order enjoining APHIS from partially deregulating RRA during the pendency of the EIS process. Most importantly, respondents cannot show that they will suffer irreparable injury if APHIS is allowed to proceed with any partial deregulation, for at least two reasons. First, if and when APHIS pursues a partial deregulation that arguably runs afoul of NEPA, respondents may file a new suit challenging such action and seeking appropriate preliminary relief. Accordingly, a permanent injunction is not now needed to guard against any present or imminent risk of likely irreparable harm. Second, a partial deregulation need not cause respondents any injury at all; if its scope is sufficiently limited, the risk of gene flow could be virtually nonexistent. Indeed, the broad injunction entered below essentially pre-empts the very procedure by which APHIS could determine, independently of the pending EIS process for assessing the effects of a *complete* deregulation, that a *limited* deregulation would not pose any appreciable risk of environmental harm. Pp. 16–23.

(d) The District Court also erred in entering the nationwide injunction against planting RRA, for two independent reasons. First, because it was inappropriate for the District Court to foreclose even the possibility of a partial and temporary deregulation, it follows that it was inappropriate to enjoin planting in accordance with such a deregulation decision. Second, an injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course. See, *e.g.*, *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 312. If, as respondents now concede, a less drastic remedy (such as partial or complete vacatur of APHIS's deregulation decision) was sufficient to redress their injury, no recourse to the additional and extraordinary relief of an injunction was warranted. Pp. 23–24.

(e) Given the District Court's errors, this Court need not address whether injunctive relief of some kind was available to respondents on the record below. Pp. 24–25.

570 F. 3d 1130, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, GINSBURG, and SOTOMAYOR, JJ., joined. STEVENS, J., filed a dissenting opinion. BREYER, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 09–475

MONSANTO COMPANY, ET AL., PETITIONERS *v.* GEERTSON SEED FARMS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 21, 2010]

JUSTICE ALITO delivered the opinion of the Court.

This case arises out of a decision by the Animal and Plant Health Inspection Service (APHIS) to deregulate a variety of genetically engineered alfalfa. The District Court held that APHIS violated the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U. S. C. §4321 *et seq.*, by issuing its deregulation decision without first completing a detailed assessment of the environmental consequences of its proposed course of action. To remedy that violation, the District Court vacated the agency's decision completely deregulating the alfalfa variety in question; ordered APHIS not to act on the deregulation petition in whole or in part until it had completed a detailed environmental review; and enjoined almost all future planting of the genetically engineered alfalfa pending the completion of that review. The Court of Appeals affirmed the District Court's entry of permanent injunctive relief. The main issue now in dispute concerns the breadth of that relief. For the reasons set forth below, we reverse and remand for further proceedings.

# I
## A

The Plant Protection Act (PPA), 114 Stat. 438, 7 U. S. C. §7701 *et seq.*, provides that the Secretary of the Department of Agriculture (USDA) may issue regulations "to prevent the introduction of plant pests into the United States or the dissemination of plant pests within the United States." §7711(a). The Secretary has delegated that authority to APHIS, a division of the USDA. 7 CFR §§2.22(a), 2.80(a)(36) (2010). Acting pursuant to that delegation, APHIS has promulgated regulations governing "the introduction of organisms and products altered or produced through genetic engineering that are plant pests or are believed to be plant pests." See §340.0(a)(2) and n. 1. Under those regulations, certain genetically engineered plants are presumed to be "plant pests"—and thus "regulated articles" under the PPA—until APHIS determines otherwise. See *ibid.;* §§340.1, 340.2, 340.6; see also App. 183. However, any person may petition APHIS for a determination that a regulated article does not present a plant pest risk and therefore should not be subject to the applicable regulations. 7 U. S. C. §7711(c)(2); 7 CFR §340.6. APHIS may grant such a petition in whole or in part. §340.6(d)(3).

In deciding whether to grant nonregulated status to a genetically engineered plant variety, APHIS must comply with NEPA, which requires federal agencies "to the fullest extent possible" to prepare an environmental impact statement (EIS) for "every recommendation or report on proposals for legislation and other major Federal actio[n] significantly affecting the quality of the human environment." 42 U. S. C. §4332(2)(C). The statutory text "speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions." *Kleppe* v. *Sierra*

*Club*, 427 U. S. 390, 410, n. 20 (1976).

An agency need not complete an EIS for a particular proposal if it finds, on the basis of a shorter "environmental assessment" (EA), that the proposed action will not have a significant impact on the environment. 40 CFR §§1508.9(a), 1508.13 (2009). Even if a particular agency proposal requires an EIS, applicable regulations allow the agency to take at least some action in furtherance of that proposal while the EIS is being prepared. See §1506.1(a) ("no action concerning the proposal shall be taken which would: (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives"); §1506.1(c) ("While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action" satisfies certain requirements).

## B

This case involves Roundup Ready Alfalfa (RRA), a kind of alfalfa crop that has been genetically engineered to be tolerant of glyphosate, the active ingredient of the herbicide Roundup. Petitioner Monsanto Company (Monsanto) owns the intellectual property rights to RRA. Monsanto licenses those rights to co-petitioner Forage Genetics International (FGI), which is the exclusive developer of RRA seed.

APHIS initially classified RRA as a regulated article, but in 2004 petitioners sought nonregulated status for two strains of RRA. In response, APHIS prepared a draft EA assessing the likely environmental impact of the requested deregulation. It then published a notice in the Federal Register advising the public of the deregulation petition and soliciting public comments on its draft EA. After

considering the hundreds of public comments that it re-
ceived, APHIS issued a Finding of No Significant Impact
and decided to deregulate RRA unconditionally and with-
out preparing an EIS.  Prior to this decision, APHIS had
authorized almost 300 field trials of RRA conducted over a
period of eight years.  App. 348.

Approximately eight months after APHIS granted RRA
nonregulated status, respondents (two conventional alfalfa
seed farms and environmental groups concerned with food
safety) filed this action against the Secretary of Agricul-
ture and certain other officials in Federal District Court,
challenging APHIS's decision to completely deregulate
RRA.  Their complaint alleged violations of NEPA, the
Endangered Species Act of 1973 (ESA), 87 Stat. 884, 16
U. S. C. §1531 *et seq.*, and the PPA.  Respondents did not
seek preliminary injunctive relief pending resolution of
those claims.  Hence, RRA enjoyed nonregulated status for
approximately two years.  During that period, more than
3,000 farmers in 48 States planted an estimated 220,000
acres of RRA.  App. 350.

In resolving respondents' NEPA claim, the District
Court accepted APHIS's determination that RRA does not
have any harmful health effects on humans or livestock.
App. to Pet. for Cert. 43a; accord, *id.*, at 45a.  Neverthe-
less, the District Court held that APHIS violated NEPA by
deregulating RRA without first preparing an EIS.  In
particular, the court found that APHIS's EA failed to
answer substantial questions concerning two broad conse-
quences of its proposed action: first, the extent to which
complete deregulation would lead to the transmission of
the gene conferring glyphosate tolerance from RRA to
organic and conventional alfalfa; and, second, the extent to
which the introduction of RRA would contribute to the
development of Roundup-resistant weeds.  *Id.,* at 52a.  In
light of its determination that the deregulation decision
ran afoul of NEPA, the District Court dismissed without

prejudice respondents' claims under the ESA and PPA.

After these rulings, the District Court granted petitioners permission to intervene in the remedial phase of the lawsuit. The court then asked the parties to submit proposed judgments embodying their preferred means of remedying the NEPA violation. APHIS's proposed judgment would have ordered the agency to prepare an EIS, vacated the agency's deregulation decision, and replaced that decision with the terms of the judgment itself. *Id.,* at 184a (proposed judgment providing that "[the federal] defendants' [June 14,] 2005 Determination of Nonregulated Status for Alfalfa Genetically Engineered for Tolerance to the Herbicide Glyphosate is hereby vacated *and replaced by the terms of this judgment*" (emphasis added)). The terms of the proposed judgment, in turn, would have permitted the continued planting of RRA pending completion of the EIS, subject to six restrictions. Those restrictions included, among other things, mandatory isolation distances between RRA and non-genetically-engineered alfalfa fields in order to mitigate the risk of gene flow; mandatory harvesting conditions; a requirement that planting and harvesting equipment that had been in contact with RRA be cleaned prior to any use with conventional or organic alfalfa; identification and handling requirements for RRA seed; and a requirement that all RRA seed producers and hay growers be under contract with either Monsanto or FGI and that their contracts require compliance with the other limitations set out in the proposed judgment.

The District Court rejected APHIS's proposed judgment. In its preliminary injunction, the District Court prohibited almost all future planting of RRA pending APHIS's completion of the required EIS. But in order to minimize the harm to farmers who had relied on APHIS's deregulation decision, the court expressly allowed those who had already purchased RRA to plant their seeds until March 30,

2007. *Id.,* at 58a. In its subsequently entered permanent injunction and judgment, the court (1) vacated APHIS's deregulation decision; (2) ordered APHIS to prepare an EIS before it made any decision on Monsanto's deregulation petition; (3) enjoined the planting of any RRA in the United States after March 30, 2007, pending APHIS's completion of the required EIS; and (4) imposed certain conditions (suggested by APHIS) on the handling and identification of already-planted RRA. *Id.,* at 79a, 109a. The District Court denied petitioners' request for an evidentiary hearing.

The Government, Monsanto, and FGI appealed, challenging the scope of the relief granted but not disputing the existence of a NEPA violation. See *Geertson Seed Farms* v. *Johanns*, 570 F. 3d 1130, 1136 (2009). A divided panel of the Court of Appeals for the Ninth Circuit affirmed. Based on its review of the record, the panel first concluded that the District Court had "recognized that an injunction does not 'automatically issue' when a NEPA violation is found" and had instead based its issuance of injunctive relief on the four-factor test traditionally used for that purpose. *Id.*, at 1137. The panel held that the District Court had not committed clear error in making any of the subsidiary factual findings on which its assessment of the four relevant factors was based. And the panel rejected the claim that the District Court had not given sufficient deference to APHIS's expertise concerning the likely effects of allowing continued planting of RRA on a limited basis. In the panel's view, APHIS's proposed interim measures would have perpetuated a system that had been found by the District Court to have caused environmental harm in the past. *Id.*, at 1139. Hence, the panel concluded that the District Court had not abused its discretion "in choosing to reject APHIS's proposed mitigation measures in favor of a broader injunction to prevent more irreparable harm from occurring." *Ibid.*

The panel majority also rejected petitioners' alternative argument that the District Court had erred in declining to hold an evidentiary hearing before entering its permanent injunction. Writing in dissent, Judge N. Randy Smith disagreed with that conclusion. In his view, the District Court was required to conduct an evidentiary hearing before issuing a permanent injunction unless the facts were undisputed or the adverse party expressly waived its right to such a hearing. Neither of those two exceptions, he found, applied here.

We granted certiorari. 558 U. S. __ (2010).

## II

## A

At the threshold, respondents contend that petitioners lack standing to seek our review of the lower court rulings at issue here. We disagree.

Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling. *Horne* v. *Flores*, 557 U. S. ___, ___ (2009) (slip op., at 8). Petitioners here satisfy all three criteria. Petitioners are injured by their inability to sell or license RRA to prospective customers until such time as APHIS completes the required EIS. Because that injury is caused by the very remedial order that petitioners challenge on appeal, it would be redressed by a favorable ruling from this Court.

Respondents do not dispute that petitioners would have standing to contest the District Court's permanent injunction order if they had pursued a different litigation strategy. Instead, respondents argue that the injury of which petitioners complain is independently caused by a part of the District Court's order that petitioners failed to challenge, namely, the vacatur of APHIS's deregulation decision. The practical consequence of the vacatur, respon-

dents contend, was to restore RRA to the status of a regulated article; and, subject to certain exceptions not applicable here, federal regulations ban the growth and sale of regulated articles. Because petitioners did not specifically challenge the District Court's vacatur, respondents reason, they lack standing to challenge a part of the District Court's order (*i.e.*, the injunction) that does not cause petitioners any injury not also caused by the vacatur. See Brief for Respondents 19–20.

Respondents' argument fails for two independent reasons. First, although petitioners did not challenge the vacatur directly, they adequately preserved their objection that the vacated deregulation decision should have been replaced by APHIS's proposed injunction. Throughout the remedial phase of this litigation, one of the main disputes between the parties has been whether the District Court was required to adopt APHIS's proposed judgment. See, *e.g.*, Intervenor-Appellants' Opening Brief in No. 07–16458 etc. (CA9), p. 59 (urging the Court of Appeals to "vacate the district court's judgment and remand this case to the district court with instructions to enter APHIS's proposed relief"); Opening Brief of Federal Defendants-Appellants in No. 16458 etc. (CA9), pp. 21, 46 ("The blanket injunction should be narrowed in accordance with APHIS's proposal"); see also Tr. of Oral Arg. 6, 25–27, 53–54. That judgment would have replaced the vacated deregulation decision with an order expressly allowing continued planting of RRA subject to certain limited conditions. App. to Pet. for Cert. 184a (proposed judgment providing that "[the federal] defendants' 14 June 2005 Determination of Nonregulated Status for Alfalfa Genetically Engineered for Tolerance to the Herbicide Glyphosate is hereby vacated *and replaced by the terms of this judgment*" (emphasis added)). Accordingly, if the District Court had adopted the agency's suggested remedy, there would still be authority for the continued planting of RRA, because there

would, in effect, be a new deregulation decision.[1]

Second, petitioners in any case have standing to challenge the part of the District Court's order enjoining partial deregulation. Respondents focus their standing argument on the part of the judgment enjoining the planting of RRA, but the judgment also states that "[b]efore granting Monsanto's deregulation petition, *even in part*, the federal defendants shall prepare an environmental impact statement." *Id.*, at 108a (emphasis added); see also *id.*, at 79a ("The Court will enter a final judgment . . . ordering the government to prepare an EIS before it makes a decision on Monsanto's deregulation petition"). As respondents concede, that part of the judgment goes beyond the vacatur of APHIS's deregulation decision. See Tr. of Oral Arg. 37, 46.

At oral argument, respondents contended that the retriction on APHIS's ability to effect a partial deregulation of RRA does not cause petitioners "an actual or an imminent harm." *Id.*, at 39–40. In order for a partial deregulation to occur, respondents argued, the case would have to be remanded to the agency, and APHIS would have to prepare an EA "that may or may not come out in favor of a partial deregulation." *Id.*, at 39. Because petitioners cannot prove that those two events would happen, respondents contended, the asserted harm caused by the District Court's partial deregulation ban is too speculative to satisfy the actual or imminent injury requirement.

We reject this argument. If the injunction were lifted, we do not see why the District Court would have to remand the matter to the agency in order for APHIS to effect a partial deregulation. And even if a remand were

---

[1] We need not decide whether the District Court had the authority to replace the vacated agency order with an injunction of its own making. The question whether petitioners are entitled to the relief that they seek goes to the merits, not to standing.

required, we perceive no basis on which the District Court could decline to remand the matter to the agency so that it could determine whether to pursue a partial deregulation during the pendency of the EIS process.

Nor is any doubt as to whether APHIS would issue a new EA in favor of a partial deregulation sufficient to defeat petitioners' standing. It is undisputed that petitioners have submitted a deregulation petition and that a partial deregulation of the kind embodied in the agency's proposed judgment would afford petitioners much of the relief that they seek; it is also undisputed that, absent the District Court's order, APHIS could attempt to effect such a partial deregulation pending its completion of the EIS. See *id.*, at 7–8, 25–27, 38. For purposes of resolving the particular standing question before us, we need not decide whether or to what extent a party challenging an injunction that bars an agency from granting certain relief must show that the agency would be likely to afford such relief if it were free to do so. In this case, as is clear from APHIS's proposed judgment and from its briefing throughout the remedial phase of this litigation, the agency takes the view that a partial deregulation reflecting its proposed limitations is in the public interest. Thus, there is more than a strong likelihood that APHIS would partially deregulate RRA were it not for the District Court's injunction. The District Court's elimination of that likelihood is plainly sufficient to establish a constitutionally cognizable injury. Moreover, as respondents essentially conceded at oral argument, that injury would be redressed by a favorable decision here, since "vacating the current injunction . . . will allow [petitioners] to go back to the agency, [to] seek a partial deregulation," even if the District Court's vacatur of APHIS's deregulation decision is left intact. *Id.*, at 38. We therefore hold that

petitioners have standing to seek this Court's review.[2]

## B

We next consider petitioners' contention that respondents lack standing to seek injunctive relief. See *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing separately for each form of relief sought" (internal quotation marks omitted)). Petitioners argue that respondents have failed to show that any of the named respondents is likely to suffer a constitutionally cognizable injury absent injunctive relief. See Brief for Petitioners 40. We disagree.

Respondents include conventional alfalfa farmers. Emphasizing "the undisputed concentration of alfalfa seed farms," the District Court found that those farmers had "established a 'reasonable probability' that their organic and conventional alfalfa crops will be infected with the engineered gene" if RRA is completely deregulated. App. to Pet. for Cert. 50a.[3]  A substantial risk of gene flow

———————

[2] We do not rest "the primary basis for our jurisdiction on the premise that the District Court enjoined APHIS from partially deregulating RRA in any sense." See *post*, at 7 (STEVENS, J., dissenting). Even if the District Court's order prohibiting a partial deregulation applies only to "the *particular* partial deregulation order proposed to the court by APHIS," see *post*, at 8, petitioners would still have standing to challenge that aspect of the order.

[3] At least one of the respondents in this case specifically alleges that he owns an alfalfa farm in a prominent seed-growing region and faces a significant risk of contamination from RRA. See Record, Doc. 62, pp. 1–2; *id.*, ¶10, at 3–4 (Declaration of Phillip Geertson in Support of Plantiffs' Motion for Summary Judgment) ("Since alfalfa is pollinated by honey, bumble and leafcutter bees, the genetic contamination of the Roundup Ready seed will rapidly spread through the seed growing regions. Bees have a range of at least two to ten miles, and the alfalfa seed farms are much more concentrated"). Other declarations in the record provide further support for the District Court's conclusion that the deregulation of RRA poses a significant risk of contamination to respondents' crops. See, *e.g.*, *id.*, Doc. 53, ¶9, at 2 (Declaration of Jim Munsch) (alleging risk of "significant contamination . . . due to the

injures respondents in several ways. For example, respondents represent that, in order to continue marketing their product to consumers who wish to buy non-genetically-engineered alfalfa, respondents would have to conduct testing to find out whether and to what extent their crops have been contaminated. See, *e.g.*, Record, Doc. 62, p. 5 (Declaration of Phillip Geertson in Support of Plantiffs' Motion for Summary Judgment) (hereinafter Geertson Declaration) ("Due to the high potential for contamination, I will need to test my crops for the presence of genetically engineered alfalfa seed. This testing will be a new cost to my seed business and we will have to raise our seed prices to cover these costs, making our prices less competitive"); *id.*, Doc. 57, p. 4 (Declaration of Patrick Trask in Support of Plaintiff's Motion for Summary Judgment) ("To ensure that my seeds are pure, I will need to test my crops and obtain certification that my seeds are free of genetically engineered alfalfa"); see also Record, Doc. 55, p. 2 ("There is zero tolerance for contaminated seed in the organic market"). Respondents also allege that the risk of gene flow will cause them to take certain measures to minimize the likelihood of potential contamination and to ensure an adequate supply of non-genetically-engineered alfalfa. See, *e.g.*, Geertson Declaration 3 (noting the "increased cost of alfalfa breeding due to potential for genetic contamination"); *id.*, at 6 ("Due to the threat of contamination, I have begun contracting with growers outside of the United States to ensure that I can supply genetically pure, conventional alfalfa seed. Finding new growers has already resulted in increased administrative

————————

compact geographic area of the prime alfalfa seed producing areas and the fact that pollen is distributed by bees that have large natural range of activity"); App. ¶8, p. 401 (Declaration of Marc Asumendi) ("Roundup alfalfa seed fields are currently being planted in all the major alfalfa seed production areas with little regard to contamination to non-GMO seed production fields").

costs at my seed business").

Such harms, which respondents will suffer even if their crops are not actually infected with the Roundup ready gene, are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis. Those harms are readily attributable to APHIS's deregulation decision, which, as the District Court found, gives rise to a significant risk of gene flow to non-genetically-engineered varieties of alfalfa. Finally, a judicial order prohibiting the growth and sale of all or some genetically engineered alfalfa would remedy respondents' injuries by eliminating or minimizing the risk of gene flow to conventional and organic alfalfa crops. We therefore conclude that respondents have constitutional standing to seek injunctive relief from the complete deregulation order at issue here.

Petitioners appear to suggest that respondents fail to satisfy the "zone of interests" test we have previously articulated as a prudential standing requirement in cases challenging agency compliance with particular statutes. See Reply Brief for Petitioners 12 (arguing that protection against the risk of commercial harm "is not an interest that NEPA was enacted to address"); *Bennett* v. *Spear*, 520 U. S. 154, 162–163 (1997). That argument is unpersuasive because, as the District Court found, respondents' injury has an environmental as well as an economic component. See App. to Pet. for Cert. 49a. In its ruling on the merits of respondents' NEPA claim, the District Court held that the risk that the RRA gene conferring glyphosate resistance will infect conventional and organic alfalfa is a significant environmental effect within the meaning of NEPA. Petitioners did not appeal that part of the court's ruling, and we have no occasion to revisit it here. Respondents now seek injunctive relief in order to avert the risk of gene flow to their crops—the very same effect that the District Court determined to be a significant environmental concern for purposes of NEPA. The

mere fact that respondents also seek to avoid certain economic harms that are tied to the risk of gene flow does not strip them of prudential standing.

In short, respondents have standing to seek injunctive relief, and petitioners have standing to seek this Court's review of the Ninth Circuit's judgment affirming the entry of such relief. We therefore proceed to the merits of the case.

## III

### A

The District Court sought to remedy APHIS's NEPA violation in three ways: First, it vacated the agency's decision completely deregulating RRA; second, it enjoined APHIS from deregulating RRA, in whole or in part, pending completion of the mandated EIS; and third, it entered a nationwide injunction prohibiting almost all future planting of RRA. *Id.*, at 108a–110a. Because petitioners and the Government do not argue otherwise, we assume without deciding that the District Court acted lawfully in vacating the deregulation decision. See Tr. of Oral Arg. 7 ("[T]he district court could have vacated the order in its entirety and sent it back to the agency"); accord, *id.*, at 15–16. We therefore address only the latter two aspects of the District Court's judgment. Before doing so, however, we provide a brief overview of the standard governing the entry of injunctive relief.

### B

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy

in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc.* v. *MercExchange, L. L. C.*, 547 U. S. 388, 391 (2006). The traditional four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation. See *Winter* v. *Natural Resources Defense Council, Inc.,* 555 U. S. ___, ___ (2008) (slip op., at 21–23).

Petitioners argue that the lower courts in this case proceeded on the erroneous assumption that an injunction is generally the appropriate remedy for a NEPA violation. In particular, petitioners note that the District Court cited pre-*Winter* Ninth Circuit precedent for the proposition that, in "'the run of the mill NEPA case,'" an injunction delaying the contemplated government project is proper "'until the NEPA violation is cured.'" App. to Pet. for Cert. 65a (quoting *Idaho Watersheds Project* v. *Hahn*, 307 F. 3d 815, 833 (CA9 2002)); see also App. to Pet. for Cert. 55a (quoting same language in preliminary injunction order). In addition, petitioners observe, the District Court and the Court of Appeals in this case both stated that, "in unusual circumstances, an injunction may be withheld, or, more likely, limited in scope" in NEPA cases. *Id.*, at 66a (quoting *National Parks & Conservation Assn.* v. *Babbitt*, 241 F. 3d 722, 737, n. 18 (CA9 2001) (internal quotation marks omitted)); 570 F. 3d, at 1137.

Insofar as the statements quoted above are intended to guide the determination whether to grant injunctive relief, they invert the proper mode of analysis. An injunction should issue only if the traditional four-factor test is satisfied. See *Winter, supra,* at ___ (slip op., at 21–24). In contrast, the statements quoted above appear to presume that an injunction is the proper remedy for a NEPA violation except in unusual circumstances. No such thumb on the scales is warranted. Nor, contrary to the reasoning of the Court of Appeals, could any such error be cured by a court's perfunctory recognition that "an injunction does

not automatically issue" in NEPA cases. See 570 F. 3d, at 1137 (internal quotation marks omitted). It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test set out above.

Notwithstanding the lower courts' apparent reliance on the incorrect standard set out in the pre-*Winter* Circuit precedents quoted above, respondents argue that the lower courts in fact applied the traditional four-factor test. In their view, the statements that injunctive relief is proper in the "run-of-the-mill" NEPA case, and that such injunctions are granted except in "unusual circumstances," are descriptive rather than prescriptive. See Brief for Respondents 28, n. 14. We need not decide whether respondents' characterization of the lower court opinions in this case is sound. Even if it is, the injunctive relief granted here cannot stand.

C

We first consider whether the District Court erred in enjoining APHIS from partially deregulating RRA during the pendency of the EIS process.[4]

The relevant part of the District Court's judgment states that, "[b]efore granting Monsanto's deregulation petition,

―――――――――

[4] Petitioners focus their challenge on the part of the District Court's order prohibiting the planting of RRA. As we explain below, however, the broad injunction against planting cannot be valid if the injunction against partial deregulation is improper. See *infra*, at 23; see also App. to Pet. for Cert. 64a (District Court order recognizing that APHIS's proposed remedy "seek[s], *in effect*, a partial deregulation that permits the continued expansion of the Roundup Ready alfalfa market subject to certain conditions" (emphasis added)). The validity of the injunction prohibiting partial deregulation is therefore properly before us. Like the District Court, we use the term "partial deregulation" to refer to any limited or conditional deregulation. See *id.*, at 64a, 69a.

*even in part*, the federal defendants shall prepare an environmental impact statement." App. to Pet. for Cert. 108a (emphasis added); see also *id.*, at 79a ("The Court will enter a final judgment . . . ordering the government to prepare an EIS before it makes a decision on Monsanto's deregulation petition"). The plain text of the order prohibits *any* partial deregulation, not just the particular partial deregulation embodied in APHIS's proposed judgment. We think it is quite clear that the District Court meant just what it said. The related injunction against planting states that "*no* [RRA] . . . may be planted" "[u]ntil the federal defendants prepare the EIS and decide the deregulation petition." *Id.*, at 108a (emphasis added). That injunction, which appears in the very same judgment and directly follows the injunction against granting Monsanto's petition "even in part," does not carve out an exception for planting subsequently authorized by a valid partial deregulation decision.

In our view, none of the traditional four factors governing the entry of permanent injunctive relief supports the District Court's injunction prohibiting partial deregulation. To see why that is so, it is helpful to understand how the injunction prohibiting a partial deregulation fits into the broader dispute between the parties.

Respondents in this case brought suit under the APA to challenge a particular agency order: APHIS's decision to *completely* deregulate RRA. The District Court held that the order in question was procedurally defective, and APHIS decided not to appeal that determination. At that point, it was for the agency to decide whether and to what extent it would pursue a *partial* deregulation. If the agency found, on the basis of a new EA, that a limited and temporary deregulation satisfied applicable statutory and regulatory requirements, it could proceed with such a deregulation even if it had not yet finished the onerous EIS required for complete deregulation. If and when the

agency were to issue a partial deregulation order, any party aggrieved by that order could bring a separate suit under the Administrative Procedure Act to challenge the particular deregulation attempted. See 5 U. S. C. §702.

In this case, APHIS apparently sought to "streamline" the proceedings by asking the District Court to craft a remedy that, in effect, would have partially deregulated RRA until such time as the agency had finalized the EIS needed for a complete deregulation. See Tr. of Oral Arg. 16, 23–24; App. to Pet. for Cert. 69a. To justify that disposition, APHIS and petitioners submitted voluminous documentary submissions in which they purported to show that the risk of gene flow would be insignificant if the District Court allowed limited planting and harvesting subject to APHIS's proposed conditions. Respondents, in turn, submitted considerable evidence of their own that seemed to cut the other way. This put the District Court in an unenviable position. "The parties' experts disagreed over virtually every factual issue relating to possible environmental harm, including the likelihood of genetic contamination and why some contamination had already occurred." 570 F. 3d, at 1135.

The District Court may well have acted within its discretion in refusing to craft a judicial remedy that would have *authorized* the continued planting and harvesting of RRA while the EIS is being prepared. It does not follow, however, that the District Court was within its rights in *enjoining* APHIS from allowing such planting and harvesting pursuant to the authority vested in the agency by law. When the District Court entered its permanent injunction, APHIS had not yet exercised its authority to partially deregulate RRA. Until APHIS actually seeks to effect a partial deregulation, any judicial review of such a decision is premature.[5]

_____

[5] NEPA provides that an EIS must be "include[d] in every recommen-

Nor can the District Court's injunction be justified as a prophylactic measure needed to guard against the possibility that the agency would seek to effect on its own the particular partial deregulation scheme embodied in the terms of APHIS's proposed judgment. Even if the District Court was not required to adopt that judgment, there was no need to stop the agency from effecting a partial deregulation in accordance with the procedures established by law. Moreover, the terms of the District Court's injunction do not just enjoin the *particular* partial deregulation embodied in APHIS's proposed judgment. Instead, the District Court barred the agency from pursuing *any* deregulation—no matter how limited the geographic area in which planting of RRA would be allowed, how great the isolation distances mandated between RRA fields and fields for growing non-genetically-engineered alfalfa, how stringent the regulations governing harvesting and distribution, how robust the enforcement mechanisms available

―――――――

dation or report on *proposals* for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U. S. C. §4332(2)(C) (emphasis added); see also *Kleppe* v. *Sierra Club*, 427 U. S. 390, 406 (1976) ("A court has no authority to depart from the statutory language and . . . determine a point during the germination process of a *potential* proposal at which an impact statement *should be prepared*" (first emphasis added)). When a particular agency proposal exists and requires the preparation of an EIS, NEPA regulations allow the agency to take at least some action pertaining to that proposal during the pendency of the EIS process. See 40 CFR §§1506.1(a), (c) (2009). We do not express any view on the Government's contention that a limited deregulation of the kind embodied in its proposed judgment would not require the prior preparation of an EIS. See Brief for Federal Respondents 21–22 (citing §1506.1(a)); Tr. of Oral Arg. 20 ("what we were proposing for the interim, that is allowing continued planting subject to various protective measures, was fundamentally different from the action on which the EIS was being prepared"). Because APHIS has not yet invoked the procedures necessary to attempt a limited deregulation, any judicial consideration of such issues is not warranted at this time.

at the time of the decision, and—consequently—no matter how small the risk that the planting authorized under such conditions would adversely affect the environment in general and respondents in particular.

The order enjoining any partial deregulation was also inconsistent with other aspects of the very same judgment. In fashioning its remedy for the NEPA violation, the District Court steered a "middle course" between more extreme options on either end. See *id.*, at 1136. On the one hand, the District Court rejected APHIS's proposal (supported by petitioners) to allow continued planting and harvesting of RRA subject to the agency's proposed limitations. On the other hand, the District Court did not bar continued planting of RRA as a regulated article under permit from APHIS, see App. to Pet. for Cert. 75a, and it expressly allowed farmers to harvest and sell RRA planted before March 30, 2007, *id.*, at 76a–79a. If the District Court was right to conclude that any partial deregulation, no matter how limited, required the preparation of an EIS, it is hard to see why the limited planting and harvesting that the District Court allowed did not also require the preparation of an EIS. Conversely, if the District Court was right to conclude that the limited planting and harvesting it allowed did not require the preparation of an EIS, then an appropriately limited partial deregulation should likewise have been possible.

Based on the analysis set forth above, it is clear that the order enjoining any deregulation whatsoever does not satisfy the traditional four-factor test for granting permanent injunctive relief. Most importantly, respondents cannot show that they will suffer irreparable injury if APHIS is allowed to proceed with any partial deregulation, for at least two independent reasons.

First, if and when APHIS pursues a partial deregulation that arguably runs afoul of NEPA, respondents may file a new suit challenging such action and seeking appropriate

preliminary relief. See 5 U. S. C. §§702, 705. Accordingly, a permanent injunction is not now needed to guard against any present or imminent risk of likely irreparable harm.

Second, a partial deregulation need not cause respondents any injury at all, much less irreparable injury; if the scope of the partial deregulation is sufficiently limited, the risk of gene flow to their crops could be virtually nonexistent. For example, suppose that APHIS deregulates RRA only in a remote part of the country in which respondents neither grow nor intend to grow non-genetically-engineered alfalfa, and in which no conventional alfalfa farms are currently located. Suppose further that APHIS issues an accompanying administrative order mandating isolation distances so great as to eliminate any appreciable risk of gene flow to the crops of conventional farmers who might someday choose to plant in the surrounding area. See, *e.g.*, Brief in Opposition 9, n. 6 (quoting study concluding "'that in order for there to be *zero* tolerance of any gene flow between a [RRA] seed field and a conventional seed field, those fields would have to have a five-mile isolation distance between them'"); see also Tr. of Oral Arg. 15–16 (representation from the Solicitor General that APHIS may impose conditions on the deregulation of RRA via issuance of an administrative order). Finally, suppose that APHIS concludes in a new EA that its limited deregulation would not pose a significant risk of gene flow or harmful weed development, and that the agency adopts a plan to police vigorously compliance with its administrative order in the limited geographic area in question. It is hard to see how respondents could show that such a limited deregulation would cause them likely irreparable injury. (Respondents in this case do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties.) In any case, the District Court's order prohibiting *any*

partial deregulation improperly relieves respondents of their burden to make the requisite evidentiary showing.[6]

Of course, APHIS might ultimately choose not to partially deregulate RRA during the pendency of the EIS, or else to pursue the kind of partial deregulation embodied in its proposed judgment rather than the very limited deregulation envisioned in the above hypothetical. Until such time as the agency decides whether and how to exercise its regulatory authority, however, the courts have no cause to intervene. Indeed, the broad injunction entered here essentially pre-empts the very procedure by which the agency could determine, independently of the pending EIS process for assessing the effects of a *complete* deregulation, that a *limited* deregulation would not pose any appreciable risk of environmental harm. See 40 CFR §§1501.4, 1508.9(a) (2009).

In sum, we do not know whether and to what extent APHIS would seek to effect a limited deregulation during the pendency of the EIS process if it were free to do so; we do know that the vacatur of APHIS's deregulation decision means that virtually no RRA can be grown or sold until such time as a new deregulation decision is in place, and we also know that any party aggrieved by a hypothetical future deregulation decision will have ample opportunity

---

[6] The District Court itself appears to have recognized that its broad injunction may not have been necessary to avert any injury to respondents. See App. to Pet. for Cert. 191a ("It does complicate it to try to fine-tune a particular remedy. So the simpler the remedy, the more attractive it is from the Court's point of view, because it appears to me enforcement is easier. Understanding it is easier, and it may be, while a blunt instrument, it may actually, for the short term, achieve its result, achieve its purpose, *even maybe it overachieves it. . . . Maybe a lot of it is not necessary. I don't know*" (emphasis added)); see also *ibid.* ("I don't say you have to be greater than 1.6 miles, you have to be away from the bees, you have be dah dah dah. That's the farm business. I'm not even in it"); *id.*, at 192a ("I am not going to get into the isolation distances").

to challenge it, and to seek appropriate preliminary relief, if and when such a decision is made. In light of these particular circumstances, we hold that the District Court did not properly exercise its discretion in enjoining a partial deregulation of any kind pending APHIS's preparation of an EIS. It follows that the Court of Appeals erred in affirming that aspect of the District Court's judgment.

## D

We now turn to petitioners' claim that the District Court erred in entering a nationwide injunction against planting RRA. Petitioners argue that the District Court did not apply the right test for determining whether to enter permanent injunctive relief; that, even if the District Court identified the operative legal standard, it erred as a matter of law in applying that standard to the facts of this case; and that the District Court was required to grant petitioners an evidentiary hearing to resolve contested issues of fact germane to the remedial dispute between the parties. We agree that the District Court's injunction against planting went too far, but we come to that conclusion for two independent reasons.

First, the impropriety of the District Court's broad injunction against planting flows from the impropriety of its injunction against partial deregulation. If APHIS may partially deregulate RRA before preparing a full-blown EIS—a question that we need not and do not decide here— farmers should be able to grow and sell RRA in accordance with that agency determination. Because it was inappropriate for the District Court to foreclose even the possibility of a partial and temporary deregulation, it necessarily follows that it was likewise inappropriate to enjoin any and all parties from acting in accordance with the terms of such a deregulation decision.

Second, respondents have represented to this Court that

the District Court's injunction against planting does not have any meaningful practical effect independent of its vacatur. See Brief for Respondents 24; see also Tr. of Oral Arg. 37 ("[T]he mistake that was made [by the District Court] was in not appreciating . . . that the vacatur did have [the] effect" of independently prohibiting the growth and sale of almost all RRA). An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course. See, *e.g.*, *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 311–312 (1982). If a less drastic remedy (such as partial or complete vacatur of APHIS's deregulation decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted. See *ibid.;* see also *Winter*, 555 U. S., at ___ (slip op., at 21–23).

E

In sum, the District Court abused its discretion in enjoining APHIS from effecting a partial deregulation and in prohibiting the possibility of planting in accordance with the terms of such a deregulation. Given those errors, this Court need not express any view on whether injunctive relief of some kind was available to respondents on the record before us. Nor does the Court address the question whether the District Court was required to conduct an evidentiary hearing before entering the relief at issue here. The judgment of the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

No. 09–475

MONSANTO COMPANY, ET AL., PETITIONERS *v.*
GEERTSON SEED FARMS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 21, 2010]

JUSTICE STEVENS, dissenting.

The Court does not dispute the District Court's critical findings of fact: First, Roundup Ready Alfalfa (RRA) can contaminate other plants. See App. to Pet. for Cert. 38a, 54a, 62a. Second, even planting in a controlled setting had led to contamination in some instances. See *id.,* at 69a–70a. Third, the Animal and Plant Health Inspection Service (APHIS) has limited ability to monitor or enforce limitations on planting. See *id.,* at 70a. And fourth, genetic contamination from RRA could decimate farmers' livelihoods and the American alfalfa market for years to come. See *id.,* at 71a; see also *id.,* at 29a–30a. Instead, the majority faults the District Court for "enjoining APHIS from partially deregulating RRA." *Ante*, at 16.

In my view, the District Court may not have actually ordered such relief, and we should not so readily assume that it did. Regardless, the District Court did not abuse its discretion when, after considering the voluminous record and making the aforementioned findings, it issued the order now before us.

I

To understand the District Court's judgment, it is necessary to understand the background of this litigation. Petitioner Monsanto Company (Monsanto) is a large cor-

poration that has long produced a weed killer called Roundup. After years of experimentation, Monsanto and co-petitioner Forage Genetics International (FGI) genetically engineered a mutation in the alfalfa genome that makes the plant immune to Roundup. Monsanto and FGI's new product, RRA, is "the first crop that has been engineered to resist a[n] herbicide" and that can transmit the genetically engineered gene to other plants. See App. to Pet. for Cert. 45a.

In 2004, in the midst of a deregulatory trend in the agricultural sector, petitioners asked APHIS to deregulate RRA, thereby allowing it to be sold and planted nationwide. App. 101a. Rather than conducting a detailed analysis and preparing an "environmental impact statement" (EIS), as required by the National Environmental Policy Act of 1969 (NEPA) for every "major Federal actio[n] significantly affecting the quality of the human environment," 42 U. S. C. §4332(2)(C), APHIS merely conducted an abbreviated "environmental assessment" (EA). During the 6-month period in which APHIS allowed public comment on its EA, the agency received 663 comments, 520 of which opposed deregulation. App. to Pet. for Cert. 29a. Farmers and scientists opined that RRA could contaminate alfalfa that has not been genetically modified, destroying the American export market for alfalfa and, potentially, contaminating other plants and breeding a new type of pesticide-resistant weed. *Id.,* at 29a–30a.

Despite substantial evidence that RRA genes could transfer to other plants, APHIS issued a Finding of No Significant Impact and agreed to deregulate RRA "unconditionally," *ante*, at 4. With no EIS to wait for and no regulation blocking its path, petitioners began selling RRA. Farmers and environmental groups swiftly brought this lawsuit to challenge APHIS's decision to deregulate, raising claims under NEPA and other statutes.

The District Court carefully reviewed a long record and

found that "APHIS's reasons for concluding" that the risks of genetic contamination are low were "not 'convincing.'" App. to Pet. for Cert. 38a. A review of APHIS's internal documents showed that individuals within the agency warned that contamination might occur. APHIS rested its decision to deregulate on its assertion that contamination risk is "not significant because it is the organic and conventional farmers' responsibility" to protect themselves and the environment. *Ibid.* Yet the agency drew this conclusion without having investigated whether such farmers "can, in fact, protect their crops from contamination." *Ibid.* The District Court likewise found that APHIS's reasons for disregarding the risk of pesticide-resistant weeds were speculative and "not convincing." *Id.*, at 46a. The agency had merely explained that if weeds acquire roundup resistance, farmers can use "'[a]lternative herbicides.'" *Ibid.* In light of the "acknowledged" risk of RRA gene transmission and the potential "impact on the development of Roundup resistant weeds," the court concluded that there was a significant possibility of serious environmental harm, and granted summary judgment for the plaintiffs. *Id.*, at 54a; see also *id.*, at 45a.

At this point, the question of remedy arose. The parties submitted proposed final judgments, and several corporations with an interest in RRA, including Monsanto, sought permission to intervene. The District Court granted their motion and agreed "to give them the opportunity to present evidence to assist the court in fashioning the appropriate scope of whatever relief is granted." *Id.,* at 54a (internal quotation marks omitted).

While the District Court considered the proposed judgments, it issued a preliminary injunction. Ordinarily, the court explained, the remedy for failure to conduct an EIS is to vacate the permit that was unlawfully given—the result of which, in this case, would be to prohibit any use of RRA. See *id.*, at 55a; see also *id.*, at 65a. But this case

presented a special difficulty: Following APHIS's unlawful deregulation order, some farmers had begun planting genetically modified RRA. *Id.*, at 55a. In its preliminary injunction, the District Court ordered that no new RRA could be planted until APHIS completed the EIS or the court determined that some other relief was appropriate. But, so as to protect these farmers, the court declined to prohibit them from "harvesting, using, or selling" any crops they had already planted. *Id.*, at 56a. And "to minimize the harm to those growers who intend to imminently plant Roundup Ready alfalfa," the court permitted "[t]hose growers who intend to plant [RRA] in the next three weeks and have already purchased the seed" to go ahead and plant. *Id.*, at 58a (emphasis deleted). Essentially, the court grandfathered in those farmers who had relied, in good faith, on APHIS's actions.

Before determining the scope of its final judgment, the District Court invited the parties and intervenors to submit "whatever additional evidence" they "wish[ed] to provide," and it scheduled additional oral argument. *Id.*, at 58a–59a. The parties submitted "competing proposals for permanent injunctive relief." *Id.,* at 60a. The plaintiffs requested that no one—not even the grandfathered-in farmers—be allowed to plant, grow, or harvest RRA until the full EIS had been prepared. *Id.*, at 64a. APHIS and the intervenors instead sought a remedy that would "facilitat[e] the continued and dramatic growth" of RRA: a "partial deregulation" order that would permit planting subject to certain conditions, such as specified minimum distances between RRA and conventional alfalfa and special cleaning requirements for equipment used on the genetically modified crop. See *id.*, at 60a–64a.

The court adopted a compromise. First, it declined to adopt the APHIS-Monsanto proposal. APHIS itself had acknowledged that "gene transmission could and had occurred," and that RRA "could result in the development

of Roundup-resistant weeds." *Id.*, at 61a–62a. In light of the substantial record evidence of these risks, the court would not agree to a nationwide planting scheme "without the benefit of the development of all the relevant data," as well as public comment about whether contamination could be controlled. *Id.*, at 68a. The "partial deregulation" proposed by petitioners, the court noted, was really "deregulation with certain conditions," *id.*, at 69a—which, for the same reasons given in the court's earlier order, requires an EIS, *ibid.* The court pointed out numerous problems with the APHIS-Monsanto proposal. Neither APHIS nor Monsanto had provided "evidence that suggests whether, and to what extent, the proposed interim conditions" would actually "be followed," and comparable conditions had failed to prevent contamination in certain limited settings. *Id.*, at 69a–70a. APHIS, moreover, conceded that "it does not have the resources to inspect" the RRA that had already been planted, and so could not possibly be expected "to adequately monitor the more than one million acres of [RRA] intervenors estimate [would] be planted" under their proposal. *Ibid.* That was especially problematic because any plan to limit contamination depended on rules about harvesting, and farmers were unlikely to follow those rules. *Id.*, at 71a. "APHIS ha[d] still not made any inquiry" into numerous factual concerns raised by the court in its summary judgment order issued several months earlier. *Id.*, at 70a.

Next, the court rejected the plaintiffs' proposed remedy of "enjoin[ing] the harvesting and sale of already planted" RRA. *Id.*, at 76a. Although any planting or harvesting of RRA poses a contamination risk, the court reasoned that the equities were different for those farmers who had already invested time and money planting RRA in good-faith reliance on APHIS's deregulation order. And small amounts of harvesting could be more easily monitored. Rather than force the farmers to tear up their crops, the

court imposed a variety of conditions on the crops' handling and distribution. *Id.*, at 77a.

As to all other RRA, however, the court sided with the plaintiffs and enjoined planting during the pendency of the EIS. Balancing the equities, the court explained that the risk of harm was great. "[C]ontamination cannot be undone; it will destroy the crops of those farmers who do not sell genetically modified alfalfa." *Id.,* at 71a. And because those crops "cannot be replanted for two to four years," that loss will be even greater. *Ibid.* On the other side of the balance, the court recognized that some farmers may wish to switch to genetically modified alfalfa immediately, and some companies like Monsanto want to start selling it to them just as fast. But, the court noted, RRA is a small percentage of those companies' overall business; unsold seed can be stored; and the companies "'have [no] cause to claim surprise'" as to any loss of anticipated revenue, as they "were aware of plaintiffs' lawsuit" and "nonetheless chose to market" RRA. *Id.*, at 72a.

Thus, the District Court stated that it would "vacat[e] the June 2005 deregulation decision"; "enjoi[n] the planting of [RRA] in the United States after March 30, 2007," the date of the decision, "pending the government's completion of the EIS and decision on the deregulation petition"; and impose "conditions on the handling and identification of already-planted [RRA]." *Id.*, at 79a. On the same day, the court issued its judgment. In relevant part, the judgment states:

> "The federal defendants' June 14, 2005 Determination of Nonregulated Status for [RRA] is VACATED. Before granting Monsanto's deregulation petition, even in part, the federal defendants shall prepare an [EIS]. Until the federal defendants prepare the EIS and decide the deregulation petition, no [RRA] may be planted. . . . [RRA already] planted before March 30,

2007 may be grown, harvested and sold subject to the following conditions." *Id.*, at 108a–109a.

## II

Before proceeding to address the Court's opinion on its own terms, it is important to note that I have reservations about the validity of those terms. The Court today rests not only the bulk of its analysis but also the primary basis for our jurisdiction on the premise that the District Court enjoined APHIS from partially deregulating RRA in any sense. See *ante*, at 9–11, 16–23.[1] That is a permissible, but not necessarily correct, reading of the District Court's judgment.

So far as I can tell, until petitioners' reply brief, neither petitioners nor the Government submitted to us that the District Court had exceeded its authority in this manner. And, indeed, the Government had not raised this issue in any court at all. Petitioners did not raise the issue in any of their three questions presented or in the body of their petition for a writ or certiorari. And they did not raise the issue in their opening briefs to this Court. Only after respondents alleged that Monsanto's injury would not be redressed by vacating the injunction, insofar as RRA would still be a regulated article, did petitioners bring the issue to the Court's attention. Explaining why they have a redressable injury, petitioners alleged that the District Court's order prevents APHIS from "implement[ing] an[y]

—————

[1] See also *ante*, at 19–20 ("[T]he District Court barred the agency from pursuing any deregulation—no matter how limited the geographic area in which planting of RRA would be allowed, how great the isolation distances mandated between RRA fields and fields for growing non-genetically-engineered alfalfa, how stringent the regulations governing harvesting and distribution, how robust the enforcement mechanisms available at the time of the decision, and—consequently—no matter how small the risk that the planting authorized under such conditions would adversely affect the environment in general and respondents in particular" (emphasis deleted)).

interim solution allowing continued planting." Reply Brief for Petitioners 5. APHIS, the party that the Court says was wrongly "barred . . . from pursuing *any* deregulation," even "in accordance with the procedures established by law," *ante*, at 19, did not complain about this aspect of the District Court's order even in its reply brief.

Thus, notwithstanding that petitioners "adequately *preserved* their objection that the vacated deregulation decision should have been replaced by APHIS's proposed injunction," *ante*, at 8 (emphasis added), the key legal premise on which the Court decides this case was never adequately *presented*. Of course, this is not standard—or sound—judicial practice. See *Kumho Tire Co.* v. *Carmichael*, 526 U. S. 137, 159 (1999) (STEVENS, J., concurring in part and dissenting in part). Today's decision illustrates why, for it is quite unclear whether the Court's premise is correct, and the Court has put itself in the position of deciding legal issues without the aid of briefing.

In my view, the District Court's judgment can fairly be read to address only (1) total deregulation orders of the kind that spawned this lawsuit, and (2) the *particular* partial deregulation order proposed to the court by APHIS. This interpretation of the judgment is more consistent with the District Court's accompanying opinion, which concluded by stating that the court "will enter a final judgment" "ordering the government to prepare an EIS before [the court] makes a decision on Monsanto's deregulation petition." App. to Pet. for Cert. 79a. The language of that opinion does not appear to "ba[r] the agency from pursuing any deregulation—no matter how limited," *ante*, at 19 (emphasis deleted). This interpretation is also more consistent with APHIS's own decision not to contest what, according to the Court, was an unprecedented infringement on the agency's statutory authority.

To be sure, the District Court's judgment is somewhat opaque. But it is troubling that we may be asserting

jurisdiction and deciding a highly factbound case based on nothing more than a misunderstanding. It is also troubling that we may be making law without adequate briefing on the critical questions we are passing upon. I would not be surprised if on remand the District Court merely clarified its order.

## III

Even assuming that the majority has correctly interpreted the District Court's judgment, I do not agree that we should reverse the District Court.

At the outset, it is important to observe that when a district court is faced with an unlawful agency action, a set of parties who have relied on that action, and a prayer for relief to avoid irreparable harm, the court is operating under its powers of equity. In such a case, a court's function is "to do equity and to mould each decree to the necessities of the particular case." *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329 (1944). "Flexibility" and "practicality" are the touchtones of these remedial determinations, as "the public interest," "private needs," and "competing private claims" must all be weighed and reconciled against the background of the court's own limitations and its particular familiarity with the case. *Id.,* at 329–330.[2]

When a district court takes on the equitable role of adjusting legal obligations, we review the remedy it crafts

––––––––

[2] See also*, e.g.*, *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U. S. 496, 500 (1941) ("The history of equity jurisdiction is the history of regard for public consequences. . . . There have been as many and as variegated applications of this supple principle as the situations that have brought it into play"); *Seymour* v. *Freer*, 8 Wall. 202, 218 (1869) ("[A] court of equity ha[s] unquestionable authority to apply its flexible and comprehensive jurisdiction in such manner as might be necessary to the right administration of justice between the parties"). Indeed, the very "ground of this jurisdiction" is a court's "ability to give a more complete and perfect remedy." 2 J. Story, Equity Jurisprudence §924, p. 225 (M. Bigelow ed. 13th ed. 1886).

for abuse of discretion. "[D]eference," we have explained, "is the hallmark of abuse-of-discretion review." *General Elec. Co.* v. *Joiner*, 522 U. S. 136, 143 (1997). Although equitable remedies are "not left to a trial court's 'inclination,'" they are left to the court's "'judgment.'" *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 416 (1975) (quoting *United States* v. *Burr*, 25 F. Cas. 30, 35 (No. 14,692d) (CC Va. 1807) (Marshall, C. J.)). The principles set forth in applicable federal statutes may inform that judgment. See *United States* v. *Oakland Cannabis Buyers' Cooperative*, 532 U. S. 483, 497 (2001) ("[A] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation" (internal quotation marks omitted)). And historically, courts have had particularly broad equitable power—and thus particularly broad discretion—to remedy public nuisances and other "'purprestures upon public rights and properties,'" *Mugler* v. *Kansas*, 123 U. S. 623, 672 (1887),[3] which include environmental harms.[4]

In my view, the District Court did not "unreasonably exercis[e]" its discretion, *Bennett* v. *Bennett*, 208 U. S. 505, 512 (1908), even if it did categorically prohibit partial deregulation pending completion of the EIS. Rather, the District Court's judgment can be understood as either of two reasonable exercises of its equitable powers.

*Equitable Application of Administrative Law*

First, the District Court's decision can be understood as an equitable application of administrative law. Faced with two different deregulation proposals, the District Court appears to have vacated the deregulation that had already occurred, made clear that NEPA requires an EIS

---

[3] See *Steelworkers* v. *United States*, 361 U. S. 39, 60–61 (1959) *(per curiam)* (reviewing history of injunctions to prevent public nuisances).

[4] See, *e.g.*, *Georgia* v. *Tennessee Copper Co.*, 206 U. S. 230 (1907) (air pollution); *Arizona Copper Co.* v. *Gillespie*, 230 U. S. 46, 56–57 (1913) (water pollution).

for any future deregulation of RRA, and partially stayed the vacatur to the extent it affects farmers who had already planted RRA.[5]

Under NEPA, an agency must prepare an EIS for "every . . . major Federal actio[n] significantly affecting the quality of the human environment." 42 U. S. C. §4332(2)(C). Recall that the District Court had found, on the basis of substantial evidence, that planting RRA can cause genetic contamination of other crops, planting in controlled settings had led to contamination, APHIS is unable to monitor or enforce limitations on planting, and genetic contamination could decimate the American alfalfa market. In light of that evidence, the court may well have concluded that any deregulation of RRA, even in a "limited . . . geographic area" with "stringent . . . regulations governing harvesting and distribution,"[6] *ante*, at 19–20, re-

_____

[5] See Reply Brief for Federal Respondents 3. There is an ongoing debate about the role of equitable adjustments in administrative law. See, *e.g.*, Levin, Vacation at Sea: Judicial Remedies and Equitable Discretion in Administrative Law, 53 Duke L. J. 291 (2003). The parties to this appeal and the majority assume that the District Court's remedy was crafted under its equity powers, and I will do the same.

[6] One of the many matters not briefed in this case is how limited a partial deregulation can be. It is not clear whether the sort of extremely limited "partial deregulations" envisioned by the Court, see *ante*, at 19–23, in which RRA is "deregulated" in one small geographic area pursuant to stringent restrictions, could be achieved only through "partial deregulation" actions, or whether they could also (or exclusively) be achieved through a more case-specific permit process. Under the applicable regulations, a regulated article may still be used subject to a permitting process. See 7 CFR §§340.0, 340.4 (2010). These permits "prescribe confinement conditions and standard operating procedures . . . to maintain confinement of the genetically engineered organism." Introduction of Organisms and Products Altered or Produced Through Genetic Engineering, 72 Fed. Reg. 39021, 39022 (2007) (hereinafter Introduction).

Ordinarily, "[o]nce an article has been deregulated, APHIS does not place any restrictions or requirements on its use." *Id.,* at 39023. As of 2007, APHIS had never—not once—granted partial approval of a

quires an EIS under NEPA. See generally D. Mandelker, NEPA Law and Litigation §§8:33–8:48 (2d ed. 2009) (describing when an EIS is required); cf. *Marsh* v. *Oregon Natural Resources Council*, 490 U. S. 360, 371 (1989) (NEPA embodies "sweeping commitment" to environmental safety and principle that "the agency will not act on incomplete information, only to regret its decision after it is too late to correct"). Indeed, it appears that any deregulation of a genetically modified, herbicide-resistant crop that can transfer its genes to other organisms and cannot effectively be monitored easily fits the criteria for when an EIS is required.[7] That is especially so when, as in this case, the environmental threat is novel. See *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. ___, ___ (2008) (slip op., at 13) (EIS is more important when party "is conducting a new type of activity with completely unknown effects on the environment").[8]

––––––––––

petition for nonregulated status. USDA, Introduction of Genetically Engineered Organisms, Draft Environmental Impact Statement, July 2007, p. 11, online at http://www.aphis.usda.gov/brs/pdf/complete_ eis.pdf (as visited June 18, 2010, and available in Clerk of Court's case file). In 2007, APHIS began contemplating a "*new* system" to allow for the release and use of genetically modified organisms, for "special cases" in which there are risks "that could be mitigated with conditions to ensure safe commercial use." Introduction 39024 (emphasis added).

[7] See, *e.g.,* 40 CFR §1508.8 (2009) (determination whether an EIS is required turns on both "[d]irect effects" and "[i]ndirect effects," and "include[s] those resulting from actions which may have both beneficial and detrimental effects even if on balance the agency believes that the effect will be beneficial"); §1508.27(b)(4) (determination whether an EIS is required turns on "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial"); §1508.27(b)(5) (determination whether an EIS is required turns on "[t]he degree to which the possible effects on the quality of the human environment are highly uncertain or involve unique or unknown risks").

[8] The Court posits a hypothetical in which APHIS deregulates RRA limited to a remote area in which alfalfa is not grown, and issues an

Moreover, given that APHIS had already been ordered to conduct an EIS on deregulation of RRA, the court could have reasonably feared that partial deregulation would undermine the agency's eventual decision. Courts confronted with NEPA violations regularly adopt interim measures to maintain the status quo, particularly if allowing agency action to go forward risks foreclosing alternative courses of action that the agency might have adopted following completion of an EIS. See D. Mandelker, NEPA Law and Litigation §4:61. The applicable regulations, to which the District Court owed deference,[9] provide that during the preparation of an EIS, "no action concerning the [agency's] proposal shall be taken which would . . . [h]ave an adverse environmental impact" or "[l]imit the choice of reasonable alternatives." 40 CFR §1506.1(a) (2009). As exemplified by the problem of what to do with farmers who had already purchased or planted RRA prior to the District Court's judgment, even minimal deregulation can limit future regulatory options. "Courts must remember that in many cases allowing an agency to proceed makes a mockery of the EIS process, converting it

_____

accompanying order "mandating isolation distances so great as to eliminate any appreciable risk of gene flow to the crops of conventional farmers who might someday choose to plant in the surrounding area." *Ante*, at 21. At the outset, it is important to note the difference between a plausible hypothetical and a piece of fiction. At least as of 2007, APHIS had never granted partial approval of a petition for nonregulated status. See n. 6, *supra.* And I doubt that it would choose to deregulate genetically modified alfalfa in a place where the growing conditions and sales networks for the product are so poor that no farmer already plants it. Moreover, the notion that this imagined deregulation would pose virtually no environmental risk ignores one of the District Court's critical findings of fact: APHIS has very limited capacity to monitor its own restrictions. The agency could place all manner of constraints on its deregulation orders; they will have no effect unless they are enforced.

[9] See *Marsh* v. *Oregon Natural Resources Council*, 490 U. S. 360, 372 (1989).

from analysis to rationalization." Herrmann, Injunctions for NEPA Violations: Balancing the Equities, 59 U. Chi. L. Rev. 1263, 1289 (1992); see also see 40 CFR §1502.5 (EIS should be implemented in manner assuring it "will not be used to rationalize or justify decisions already made").

Although the majority does not dispute that the District Court could have reasonably concluded that NEPA requires an EIS for even partial deregulation of RRA, it suggests that any such conclusion would have been incompatible with the court's decision to permit limited harvesting by farmers who had already planted RRA. See *ante*, at 20.[10]  I do not see the "inconsisten[cy]." *Ibid*. NEPA does not apply to actions by federal courts. See 40 CFR §1508.12.  Exercising its equitable discretion to balance the interests of the parties and the public, the District Court would have been well within its rights to find that NEPA requires an EIS before the agency grants "Monsanto's deregulation petition, even in part," App. to Pet. for Cert. 108a, yet also to find that a partial stay of the vacatur was appropriate to protect the interests of those farmers who had already acted in good-faith reliance on APHIS.

Similarly, I do not agree that the District Court's ruling was "premature" because APHIS had not yet effected any partial deregulations, *ante*, at 19.  Although it is "for the agency to decide whether and to what extent" it will pursue deregulation, *ante*, at 17, the court's application of NEPA to APHIS's regulation of RRA might have controlled any deregulation during the pendency of the EIS. Petitioners and APHIS had already come back to the court

---

[10]The Court states that the order permitted both harvesting and planting.  But the court's final judgment permitted only sale and harvesting of RRA planted *before* March 30, 2007, more than a month before the judgment.  See App. to Pet. for Cert. 109a; see also *id.*, at 79a.

with a proposed partial deregulation order which, the court explained, was incompatible with its determination that there is a substantial risk of gene spreading and that APHIS lacks monitoring capacity. That same concern would apply to *any* partial deregulation order. The court therefore had good reason to make it clear, upfront, that the parties should not continue to expend resources proposing such orders, instead of just moving ahead with an EIS. Cf. *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U. S. 496, 500 (1941) ("The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision"). Indeed, it was APHIS itself that "sought to 'streamline'" the process. *Ante*, at 18.

*Injunctive Relief*

Second, the District Court's judgment can be understood as a reasonable response to the nature of the risks posed by RRA. Separate and apart from NEPA's requirement of an EIS, these risks were sufficiently serious, in my view, that the court's injunction was a permissible exercise of its equitable authority.

The District Court found that gene transfer can and does occur, and that if it were to spread through open land the environmental and economic consequences would be devastating. Cf. *Amoco Production Co.* v. *Gambell*, 480 U. S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable"). Although "a mere possibility of a future nuisance will not support an injunction," courts have never required proof "that the nuisance *will* occur"; rather, "it is sufficient . . . that the *risk* of its happening is greater than a reasonable man would incur." 5 J. Pomeroy, A Treatise on Equity Jurisprudence and Equitable Remedies, §1937 (§523), p. 4398 (2d ed. 1919). Once gene transfer occurred in American fields, it "would be difficult—if

not impossible—to reverse the harm." *Hollingsworth* v. *Perry*, 558 U. S. __, __ (2010) *(per curiam)* (slip op., at 12).

Additional considerations support the District Court's judgment. It was clear to the court that APHIS had only limited capacity to monitor planted RRA, and some RRA had already been planted. The marginal threat posed by additional planting was therefore significant. Injunctive remedies are meant to achieve a "nice adjustment and reconciliation between the competing claims" of injury by "mould[ing] each decree to the necessities of the case." *Weinberger* v. *Romero-Barcelo,* 456 U. S. 305, 312 (1982) (internal quotation marks omitted). Under these circumstances, it was not unreasonable for the court to conclude that the most equitable solution was to allocate the limited amount of potentially safe RRA to the farmers who had already planted that crop.[11]

The Court suggests that the injunction was nonetheless too sweeping because "a partial deregulation need not cause respondents any injury at all . . . if the scope of the partial deregulation is sufficiently limited, the risk of gene flow to their crops could be virtually nonexistent." *Ante*, at 21. The Court appears to reach this conclusion by citing one particular study (in a voluminous record), rather than any findings of fact.[12] Even assuming that this study is

---

[11] As explained previously, I do not see the court's broad injunction as "inconsistent," *ante*, at 20, with its decision that farmers who had already planted RRA could harvest their crop. The equities are different for farmers who relied on the agency than for companies like Monsanto that developed an organism knowing it might be regulated; and APHIS could monitor only a limited amount of RRA.

[12] The Court also hypothesizes a set of growing conditions that would isolate RRA from the plaintiffs in this case, even if not from other farmers. See *ante*, at 21–22. As already explained, these hypotheticals are rather unrealistic. See n. 8, *supra.* And, given that the plaintiffs include environmental organizations as well as farmer and consumer associations, it is hard to see how APHIS could so carefully isolate and protect their interests. In any event, because APHIS concedes that it

correct, the Court ignores the District Court's findings that gene flow is likely and that APHIS has little ability to monitor any conditions imposed on a partial deregulation. Limits on planting or harvesting may operate fine in a laboratory setting, but the District Court concluded that many limits will not be followed and cannot be enforced in the real world.[13]

Against that background, it was perfectly reasonable to wait for an EIS. APHIS and petitioners argued to the District Court that partial deregulation could be safely implemented, they submitted evidence intended to show that planting restrictions would prevent the spread of the newly engineered gene, and they contested "virtually every factual issue relating to possible environmental harm." *Geertson Seed Farms* v. *Johanns,* 570 F. 3d 1130, 1135 (CA9 2009). But lacking "the benefit of the development of all the relevant data," App. to Pet. for Cert. 68a, the District Court did not find APHIS's and petitioners' assertions to be convincing. I cannot say that I would have found otherwise. It was reasonable for the court to conclude that planting could not go forward until more

—————

cannot monitor such limits, rules that protect these or any other parties may be merely hortatory in practice. Moreover, although we have not squarely addressed the issue, in my view "[t]here is no general requirement that an injunction affect only the parties in the suit." *Bresgal* v. *Brock*, 843 F. 2d 1163, 1169 (CA9 1987). To limit an injunction against a federal agency to the named plaintiffs "would only encourage numerous other" regulated entities "to file additional lawsuits in this and other federal jurisdictions." *Livestock Marketing Assn.* v. *United States Dept. of Agriculture*, 207 F. Supp. 2d 992, 1007 (SD 2002), aff'd, 335 F. 3d 711, 726 (CA8 2003).

[13] The majority notes that the District Court acknowledged, at a hearing several months before it issued the judgment, that a simple but slightly overinclusive remedy may be preferable to an elaborate set of planting conditions. See *ante,* at 22, n. 6. Quite right. As the District Court said to APHIS's lawyer at that hearing, if the agency issues an elaborate set of precautions, "I don't know how you even start to enforce it." App. to Pet. for Cert. 190a–191a.

complete study, presented in an EIS, showed that the known problem of gene flow could, in reality, be prevented.[14]

The District Court's decision that more study was needed to assess whether limits on deregulation could prevent environmental damage is further reinforced by the statutory context in which the issue arose. A court's equitable discretion must be guided by "recognized, defined public policy." *Meredith* v. *Winter Haven*, 320 U. S. 228, 235 (1943); see also *Hecht Co.* v. *Bowles*, 321 U. S. 321, 331 (1944) (explaining that when a court evaluates an agency's decision against the background of a federal statute, the court's discretion "must be exercised in light of the large objectives of the Act"). Congress recognized in NEPA that complex environmental cases often require exceptionally sophisticated scientific determinations, and that agency decisions should not be made on the basis of "incomplete information." *Marsh* v. *Oregon Natural Resources Council*, 490 U. S. 360, 371 (1989). Congress also recognized that agencies cannot fully weigh the consequences of these decisions without obtaining public comments through an EIS. See *Robertson* v. *Methow Valley Citizens Council,* 490 U. S. 332, 350 (1989).[15] While a court may not presume that a NEPA violation requires an injunction, it may take into account the principles embod-

——————

[14] I suspect that if APHIS and petitioners had come back to the court with more convincing evidence prior to completing an EIS, and moved to modify the court's order, the court would have done so. Indeed, the District Court showed a willingness to recalibrate its order when it amended its judgment just a few months after the judgment's issuance in light of APHIS's submission that certain requirements were impractical. See App. to Pet. for Cert. 111a–114a.

[15] Accordingly, while "NEPA itself does not mandate particular results," it does mandate a particular process and embodies the principle that federal agencies should "carefully conside[r] detailed information" before incurring potential environmental harm. *Robertson,* 490 U. S., at 350, 349.

ied in the statute in considering whether an injunction would be appropriate. This District Court had before it strong evidence that gene transmission was likely to occur and that limits on growing could not be enforced. It also had a large amount of highly detailed evidence about whether growing restrictions, even if enforced, can prevent transmission. That evidence called into question the agency's own claims regarding the risks posed by partial deregulation. In enjoining partial deregulation until it had the benefit of an EIS to help parse the evidence, the court acted with exactly the sort of caution that Congress endorsed in NEPA.

Finally, it bears mention that the District Court's experience with the case may have given it grounds for skepticism about the representations made by APHIS and petitioners. Sometimes "one judicial actor is better positioned than another to decide the issue in question." *Miller* v. *Fenton*, 474 U. S. 104, 114 (1985). A "district court may have insights not conveyed by the record." *Pierce* v. *Underwood*, 487 U. S. 552, 560 (1988). In this case, the agency had attempted to deregulate RRA without an EIS in spite of ample evidence of potential environmental harms. And when the court made clear that the agency had violated NEPA, the agency responded by seeking to "'streamline'" the process, *ante*, at 18, submitting a deregulation proposal with Monsanto that suffered from some of the same legal and empirical holes as its initial plan to deregulate. Against that background, the court may have felt it especially prudent to wait for an EIS before concluding that APHIS could manage RRA's threat to the environment.

*    *    *

The District Court in this case was put in an "unenviable position." *Ibid.* In front of it was strong evidence that RRA poses a serious threat to the environment and to

STEVENS, J., dissenting

American business, and that limits on RRA deregulation might not be followed or enforced—and that even if they were, the newly engineered gene might nevertheless spread to other crops. Confronted with those disconcerting submissions, with APHIS's unlawful deregulation decision, with a group of farmers who had staked their livelihoods on APHIS's decision, and with a federal statute that prizes informed decisionmaking on matters that seriously affect the environment, the court did the best it could. In my view, the District Court was well within its discretion to order the remedy that the Court now reverses. Accordingly, I respectfully dissent.