**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

COTTONWOOD ENVIRONMENTAL
LAW CENTER,
*Plaintiff-Appellee
/Cross-Appellant*,

v.

UNITED STATES FOREST SERVICE;
FAYE KRUEGER, in her official
capacity as Regional Forester for the
U.S. Forest Service, Region One,
*Defendants-Appellants
/Cross-Appellees*.

Nos. 13-35624
         13-35631

D.C. No.
9:12-cv-00045-
DLC

OPINION

Appeal from the United States District Court
for the District of Montana
Dana L. Christensen, Chief District Judge, Presiding

Argued and Submitted
July 7, 2014—Portland, Oregon

Filed June 17, 2015

Before:  Harry Pregerson, Richard A. Paez,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Paez;
Partial Concurrence and Partial Dissent by Judge Pregerson

# SUMMARY[*]

### Environmental Law

The panel affirmed the district court's holding that the United States Forest Service violated Section 7 of the Endangered Species Act when it failed to reinitiate consultation after the United States Fish and Wildlife Service designated critical habitat for the Canada lynx on National Forest land; affirmed the district court's denial of injunctive relief to Cottonwood Environmental Law Center; and remanded to provide Cottonwood an opportunity to make an evidentiary showing that specific projects would likely cause irreparable damage to its members' interests.

In 2000, the Fish and Wildlife Service listed the Canada lynx as a threatened species under the Endangered Species Act, and in 2006 designated critical habitat that did not include any National Forest lands. In 2007, the Forest Service adopted the Lynx Amendments, which set specific guidelines and standards for permitting activities that were determined likely to have an adverse effect on the Canada lynx. The Forest Service initiated Section 7 consultation with the Fish and Wildlife Service, which determined that the Forest Service's standards and guidelines did not jeopardize the Canada lynx. Subsequently, the Fish and Wildlife Service discovered that its decisions relating to the designation of critical habitat were flawed, and after reevaluating the data the Fish and Wildlife Service designated extensive National Forest land as critical habitat. The district court determined

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that the Forest Service violated the Endangered Species Act when it decided not to reinitiate consultation after the Fish and Wildlife Service revised its critical habitat designation to include National Forest land.

The panel held that Cottonwood had Article III standing to challenge the Lynx Amendments. The panel also held that Cottonwood's lawsuit was ripe for adjudication. The panel further held that pursuant to the Endangered Species Act's implementing regulations, the Forest Service was required to reinitiate consultation on the Lynx Amendments when the Fish and Wildlife Service designated critical habitat in National Forests.

Addressing Cottonwood's cross-appeal challenging the district court's denial of its request for injunctive relief, the panel held that there is no presumption of irreparable injury where there has been a procedural violation in Endangered Species Act cases. The panel held that a plaintiff must show irreparable injury to justify injunctive relief. The panel recognized that the presumption of irreparable harm in *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985), was no longer good law following Supreme Court cases addressing injunctive relief in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), and *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). The panel further held that Cottonwood should not be faulted for relying on *Thomas* as a basis for injunctive relief, and remanded on an open record to allow Cottonwood an opportunity to make a showing of irreparable injury.

Judge Pregerson concurred in part and dissented in part. Dissenting from Section VI of the majority opinion concerning injunctive relief, Judge Pregerson would not read

*Winter* and *Monsanto* as overruling *Thomas*. He would apply *Thomas* and grant Cottonwood's request for an injunction pending compliance with the Endangered Species Act's Section 7 consultation requirements.

## COUNSEL

Allen M. Brabender (argued), Attorney; Robert G. Dreher, Acting Assistant Attorney General; John H. Martin, Attorney, United States Department of Justice, Environmental and Natural Resources Division, Washington, D.C.; Andrew R. Varcoe, United States Department of Agriculture, Office of the General Counsel, Washington, D.C., for Plaintiffs-Appellants and Cross-Appellees.

Matt Kenna (argued), Attorney, Durango, Colorado; John Meyer, Attorney, Cottonwood Environmental Law Center, Sandpoint, Idaho, for Plaintiff-Appellee and Cross-Appellant.

Robert Molinelli and Scott W. Horngren, American Forest Resource Council, Portland, Oregon, for Amici Curiae American Forest Resource Council, Public Lands Council, Montana Wood Products Association, Inc., Montana Logging Association, Associated Logging Contractors, Inc.—Idaho, California Forestry Association, and Douglas Timber Operators.

Douglas A. Ruley, Vermont Law School, Environmental & Natural Resources Law Clinic, South Royalton, Vermont, for Amici Curiae Big Wild Adventures and Natural Exposures.

**OPINION**

PAEZ, Circuit Judge:

In 2000, the United States Fish and Wildlife Service ("FWS") listed the Canada lynx, a snow-sturdy cousin to the bobcat, as a threatened species under the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531 *et seq*. FWS designated critical habitat for the Canada lynx in 2006, but did not include any National Forest System land. Subsequently, the United States Forest Service ("Forest Service") issued standards and guidelines for land management activities on National Forest land that responded to FWS's listing and designation decisions. The Forest Service then initiated consultation with FWS under Section 7 of the ESA, 16 U.S.C. § 1536(a)(2). FWS determined that the Forest Service's standards and guidelines did not jeopardize the Canada lynx. Shortly after completing the consultation process, FWS discovered that its decisions relating to the designation of critical habitat for the Canada lynx were flawed. After re-evaluating the data, FWS designated extensive National Forest land as critical habitat.

In this case, we must decide whether the district court properly determined that the Forest Service violated the ESA when it decided not to reinitiate consultation after the FWS revised its critical habitat designation to include National Forest land. Before doing so, however, we address the Forest Service's arguments that Cottonwood lacks standing to bring its claim and that the claim is not ripe for review. Because we conclude that Cottonwood's claim is justiciable, and that the Forest Service violated the ESA, we proceed to consider whether the district court erred in denying injunctive relief to Cottonwood. Although we affirm the district court's ruling,

we remand for further proceedings to allow Cottonwood an opportunity to make the necessary showing in support of injunctive relief.

## I. Background

In 2000, after eight years of litigation by conservation groups, FWS listed the distinct population segment of Canada lynx in the contiguous forty-eight states as a threatened species. *Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Contiguous U.S. Distinct Population Segment of the Canada Lynx and Related Rule*, 65 Fed. Reg. 16052-01, 16052, 16061 (Mar. 24, 2000). Six years later, FWS designated 1,841 square miles of land as critical habitat for the Canada lynx. *Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx*, 71 Fed. Reg. 66008-01, 66030 (Nov. 9, 2006). The designation included 1,389 square miles in the Northern Rocky Mountains "critical habitat unit."[1] FWS did not, however, designate any National Forest land as critical habitat.

In March 2007, the Forest Service adopted the Northern Rocky Mountains Lynx Management Direction, which is commonly referred to as the "Lynx Amendments." The Lynx Amendments were designed to "incorporate management

---

[1] FWS divides critical habitat for the Canada lynx into five units, including: Maine ("Unit 1"), Minnesota ("Unit 2"), Northern Rocky Mountains ("Unit 3"), North Cascades ("Unit 4"), and Greater Yellowstone Area ("Unit 5"). *Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx*, 74 Fed. Reg. 8616-01 (Feb. 25, 2009).

direction in land management plans that conserves and promotes recovery of Canada lynx . . . while preserving the overall multiple-use direction in existing plans." The Lynx Amendments set specific guidelines and standards for permitting activities that are determined likely to have an adverse effect on Canada lynx. These activities include over-the-snow recreational activity, wildland fire management, pre-commercial forest thinning, and other projects that might affect the Canada lynx. The Forest Service amended the Forest Plans[2] for eighteen National Forests to include the Lynx Amendments.

The Forest Service initiated Section 7 consultation with FWS, the consulting agency. FWS issued a biological opinion ("BiOp") in March 2007, which determined that the management direction in the Lynx Amendments did not jeopardize the Canada lynx. The BiOp concluded that "[n]o critical habitat has been designated for this species on Federal lands within the [areas governed by the Lynx Amendments], therefore none will be affected." Just four months later, however, FWS announced that its critical habitat designation had been "improperly influenced by then deputy assistant secretary of the Interior Julie MacDonald and, as a result, may not be supported by the record, may not be adequately explained, or may not comport with the best available scientific and commercial information." *Endangered and Threatened Wildlife and Plants; Revised Designation of*

---

[2] Pursuant to the National Forest Management Act, 16 U.S.C. § 1600 *et seq.*, the Forest Service must promulgate Forest Plans, also known as Land Resource Management Plans, to "guide sustainable, integrated resource management of the resources within the plan area in the context of the broader landscape, giving due consideration to the relative values of the various resources in particular areas." 36 C.F.R. § 219.1(b).

*Critical Habitat for the Contiguous United States Distinct Population Segment of the Canada Lynx*, 74 Fed. Reg. 8616-01, 8618 (Feb. 25, 2009).  In 2009, FWS revised its critical habitat designation upward from 1,841 square miles to 39,000 square miles.  *Id.* at 8642.  The revised designation included more than 10,000 square miles in the Northern Rocky Mountains critical habitat unit.  *Id.*  Unlike the 2006 designation, the 2009 revised designation identified critical habitat in eleven National Forests.  Despite this significant addition of critical habitat in the National Forests, the Forest Service declined to reinitiate Section 7 consultation with FWS on the Lynx Amendments.  Thereafter, FWS issued BiOps determining that two projects within the Gallatin Forest, considered occupied by the Canada lynx, were unlikely to modify or adversely affect the lynx's critical habitat.[3]

In 2012, the Cottonwood Environmental Law Center ("Cottonwood") filed this action in district court alleging that the Forest Service violated the ESA by failing to reinitiate consultation.  The parties filed cross-motions for summary judgment.  The court ruled that the revised designation of critical habitat for the Canada lynx required reinitiation of Section 7 consultation on the Lynx Amendments.  *Salix v. U.S. Forest Serv.*, 944 F. Supp. 2d 984, 986 (D. Mont. 2013). Although the court granted summary judgment to Cottonwood and ordered reinitiation of consultation, it declined to enjoin any specific project.  *Salix*, 944 F. Supp. 2d at 1000–02.

---

[3] *See infra* notes 6 and 8.

The parties filed timely cross-appeals.**[4]**

## II. Standard of Review

We review de novo a district court's decisions on cross-motions for summary judgment. *Hoopa Valley Indian Tribe v. Ryan*, 415 F.3d 986, 989 (9th Cir. 2005). We also review de novo a district court's rulings on questions of standing and ripeness. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011). We review the denial of injunctive relief for abuse of discretion. *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1123 (9th Cir. 2006).

## III. Standing

The Forest Service first argues that Cottonwood lacks Article III standing to challenge the Lynx Amendments because it brought a programmatic challenge, rather than a challenge to a specific implementing project that poses an imminent risk of harm to its members. As discussed below, we conclude otherwise.

## A.

To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.*

---

**[4]** We have jurisdiction pursuant to 28 U.S.C. § 1291.

*v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). An association or organization has standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). An organization can satisfy the concrete harm requirement by alleging "an injury to the recreational or even the mere esthetic interests" of its members. *Jayne v. Sherman*, 706 F.3d 994, 999 (9th Cir. 2013) (internal quotation marks omitted).

The Forest Service argues that the declarations Cottonwood filed in the district court on behalf of its members do not satisfy Article III standing requirements, as articulated in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009). In particular, the Forest Service argues that Cottonwood does not have standing because Cottonwood only challenges the failure to reinitiate consultation, rather than particular actions that would more directly injure Cottonwood's members. In *Summers*, a group of environmental organizations sought a nationwide injunction against the enforcement of regulations issued by the Forest Service that exempted small-scale fire-control and timber-salvage projects from the notice, comment, and appeal process that applied to more substantial land management decisions. *Id.* at 490. Plaintiffs also specifically challenged a 238-acre salvage sale of timber, called the Burnt Ridge Project, in the Sequoia National Forest. *Id.* at 491. During the course of litigation, the parties settled their dispute over the Burnt Ridge Project. *Id.* After the settlement was in place, the district court proceeded to invalidate five

regulations and grant a nationwide injunction enjoining their enforcement. *Id.* at 492. We affirmed. *Id.*

Reversing, the Supreme Court held that the plaintiffs failed to establish injury in fact necessary to satisfy Article III standing requirements. *Id.* at 494–97. The plaintiffs filed only one affidavit—from Jim Bensman, a member of one of the plaintiff organizations—that purported to relate a threatened interest beyond the Burnt Ridge Project. *Id.* at 495. The Court held that Bensman's representation of general plans to visit "several unnamed National Forests in the future" was insufficient to establish standing because Bensman "fail[ed] to allege that *any* particular timber sale or other project claimed to be unlawfully subject to the regulations will impede a specific and concrete plan . . . to enjoy the National Forests." *Id.* The Court emphasized that, although Bensman referred to a series of projects in the Allegheny National Forest, Bensman did not "assert . . . any firm intention to visit their locations, saying only that [he] 'wants to' go there . . . . Such 'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of . . . 'actual or imminent' injury . . . ." *Id.* at 496 (internal quotation marks and citations omitted). Thus, the Court concluded that there was "a chance, but . . . hardly a likelihood, that Bensman's wanderings w[ould] bring him to a parcel about to be affected by a project unlawfully subject to the regulations." *Id.* at 495.

There is a clear contrast between the specificity of Cottonwood's declarations and Bensman's affidavit. Cottonwood's declarations establish that its members extensively utilize specific National Forests where the Lynx Amendments apply and demonstrate their date-certain plans

to visit the forests for the express purpose of viewing, enjoying, and studying Canada lynx.[5]

For instance, the declaration of Sara Jane Johnson describes a twenty-year history of lynx-related recreational activity in the Gallatin, Flathead, and Helena National Forests with plans to return in "spring and summer of 2013." Similarly, the declaration of Jennifer Pulchinski describes several past trips she took to the Gallatin and Custer National Forests to look for Canada lynx, and her plans to take a similar trip in "mid-July of 2013." Further, several declarations state that Cottonwood's members engage in lynx-related recreation within specific project areas that have applied, or will apply, the management direction in the Lynx Amendments. For example, Joe Milbrath states that he has "already recreated in the Bozeman Watershed Project area, and ha[s] definitive plans to ski in the area next spring and to look for signs of Canada lynx."[6] Cottonwood's members assert that the Forest Service's failure to reinitiate consultation will cause aesthetic, recreational, scientific, and

---

[5] As specified in the 2007 BiOp, the following National Forests are considered occupied by the Canada lynx: Bridger-Teton, Clearwater, Custer, Flathead, Gallatin, Helena, Idaho Panhandle, Kootenai, Lewis and Clark, Lolo, Shoshone, and the Targhee. The following six National Forests contain lynx habitat, but are not occupied by the Canada lynx: Ashley, Beaverhead-Deerlodge, Bighorn, Bitterroot, Nez Perce, and Salmon-Challis.

[6] The Bozeman Municipal Watershed Fuel Reduction Project area is located in the Gallatin National Forest in Montana. The purpose of the project is to treat vegetation and fuel conditions to diminish the impact of wildland fires in the area. The project includes thinning of mature stands and smaller diameter trees, among other strategies. In November 2009, FWS issued a BiOp concluding that the project was "not likely to result in the destruction or adverse modification of lynx critical habitat."

spiritual injury, in the specific forests and project areas covered by the Lynx Amendments.   Unlike Bensman's affidavit in *Summers*, these declarations sufficiently establish "a geographic nexus between the individual asserting the claim and the location suffering an environmental impact." *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011) (internal quotation marks omitted); *see also Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010).

## B.

This is not the first time we have held that a plaintiff has standing to challenge programmatic management direction without also challenging an implementing project that will cause discrete injury.   In *Sierra Forest Legacy*, a post-*Summers* case, we explained that "a procedural injury is complete after [a Forest Plan] has been adopted, so long as [] it is fairly traceable to some action that will affect the plaintiff's interests."[7]   646 F.3d at 1179.  As in *Sierra Forest*

---

[7] The Forest Service argues that this is not a procedural rights case.  The Forest Service relies on a misreading of *Lujan* to support its argument. Although *Lujan* explained that there can be no standing for the assertion of procedural rights where plaintiffs raise "only a generally available grievance" about the government's failure to comply with a statutory requirement, the Court recognized that procedural rights exist where the violation is connected to a concrete injury. *Lujan*, 504 U.S. at 573 & n.8. Here, Cottonwood does not allege the "deprivation of a procedural right without some concrete interest that is affected by the deprivation . . . ," *Summers*, 555 U.S. at 496, but rather "a procedural requirement the disregard of which could impair a separate concrete interest of theirs," *Lujan*, 504 U.S. at 572.  Accordingly, along with other circuits, we have recognized a procedural rights theory of standing in the context of alleged Section 7 violations.  *See, e.g.*, *Natural Res. Def. Council v. Jewell*, 749 F.3d 776, 782–83 (9th Cir. 2014) (en banc); *Salmon Spawning &*

*Legacy*, Cottonwood properly alleges procedural injury stemming from the Forest Service's decision not to reinitiate consultation on the Lynx Amendments. The declarations connect that procedural injury to imminent harm in specific forests and project areas. Cottonwood was not required to challenge directly any specific project because, as in *Sierra Forest Legacy*, the "procedural injury [was] complete." *See id.*; *see also Jayne*, 706 F.3d at 999–1000 (holding that plaintiffs had standing to challenge a programmatic rule without challenging a specific implementing project).

Although the Forest Service acknowledges that Cottonwood's members have a relationship to the areas affected by the Bozeman Municipal Watershed Project and the East Boulder Fuels Reduction Project,[8] it argues that Cottonwood "failed to link these projects, or the absence of the reinitiation of programmatic consultation, to any specific injury to its members' interests." The Forest Service argues that, because there was Section 7 consultation on these individual projects after the revised critical habitat designation, and because there was a determination that the projects would not have an adverse impact on lynx critical

---

*Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008); *In re Endangered Species Act Section 4 Deadline Litig.–MDL No. 2165*, 704 F.3d 972, 977 (D.C. Cir. 2013); *Sierra Club v. Glickman*, 156 F.3d 606, 613 (5th Cir. 1998).

[8] The East Boulder Fuels Reduction Project area is located in the Gallatin National Forest in Montana. The purpose of this project is to reduce hazardous fuel loading in the Wildland Urban Interface along the East Boulder River drainage by thinning and clearing vegetation across 872 acres. In March 2009, FWS issued a BiOp concluding that this project was "not likely to result in the destruction or adverse modification of lynx critical habitat."

habitat, no injury resulted from the failure to reinitiate consultation on the Lynx Amendments.

The Forest Service's argument is not persuasive as it overlooks a significant aspect of the consultation process. Although the Forest Service may initiate Section 7 consultation with FWS on individual projects, FWS bases its analysis of those projects largely on the Lynx Amendments and corresponding 2007 BiOp.[9]  For instance, the BiOp for the Bozeman Municipal Watershed Fuel Reduction Project ("Bozeman BiOp") cites to the Lynx Amendments and the 2007 BiOp as primary sources of information, and states that individual projects will be evaluated against the standards and guidelines in the Lynx Amendments.  In fact, the Bozeman BiOp frames its ultimate conclusion in terms of those standards: "[w]e have determined that the proposed action is in compliance with the [Lynx Amendments], and that its effects on lynx were included in those anticipated and analyzed in the 2007 biological opinion on the [Lynx Amendments]."  Thus, even though individual projects may trigger additional Section 7 scrutiny, that scrutiny is dependent, in large part, on the Lynx Amendments and the 2007 BiOp that were completed before critical habitat was designated on National Forest land.  Further, project-specific consultations do not include a unit-wide analysis comparable in scope and scale to consultation at the programmatic level.

---

[9] This is consistent with FWS's own explanation of how a programmatic Section 7 consultation will affect consultation on implementing projects: "In issuing its biological opinion on an action, [FWS's] finding under section 7(a)(2) entails an assessment of the degree of impact that action will have on a listed species.  Once evaluated, that degree of impact is factored into all future section 7 consultations conducted in the area." *Interagency Cooperation-Endangered Species Act of 1973 as Amended; Final Rule*, 51 Fed. Reg. 19,926-01, 19,932 (June 3, 1986).

## C.

The Forest Service's insistence that Cottonwood must establish how the failure to reinitiate consultation on the Lynx Amendments would lead to different, injurious results at the project-specific level places an inappropriate burden on Cottonwood. That is, Cottonwood is not required to establish what a Section 7 consultation would reveal, or what standards would be set, if the Forest Service were to reinitiate consultation. Ideally, that is the objective and purpose of the consultation process. *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc). Thus, where a procedural violation is at issue, a plaintiff need not "meet[] all the normal standards for redressability and immediacy."[10] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). In such a case, we have explained that "a litigant need only demonstrate that he has a procedural right that, if exercised, *could* protect his concrete interests and that those interests fall within the zone of interests protected by the statute at issue." *Jewell*, 749 F.3d at 783 (internal alterations and quotations omitted). Cottonwood has properly alleged that the reinitiation of consultation could result in the protection of its members' interests in specific National Forests and project areas where those members recreate. *See id.* Those interests are clearly within the "zone of interests protected by the [ESA]." *See id.*

---

[10] As the D.C. Circuit has explained, the doctrine of procedural rights "relieves the plaintiff of the need to demonstrate that (1) the agency action would have been different but for the procedural violation, and (2) court-ordered compliance with the procedure would alter the final result." *In re Endangered Species Act*, 704 F.3d at 977 (internal quotation marks and alterations omitted).

The standing analysis in this case is strikingly similar to our analysis in *Salmon Spawning*, 545 F.3d 1220. In *Salmon Spawning*, an alliance of environmental organizations filed suit against several agencies for failing to reinitiate Section 7 consultation after new information emerged about protected salmon. *Id.* at 1224. Citing *Lujan*, we determined that, because the plaintiffs had properly alleged a procedural harm, the standards for causation and redressability were relaxed. *Id*. at 1229 (citing *Lujan*, 504 U.S. at 572 n.7). We said that "uncertain[ty about] whether reinitiation will ultimately benefit the groups (for example, by resulting in a 'jeopardy' determination) does not undermine [the plaintiffs'] standing." *Salmon Spawning*, 545 F.3d at 1229. Thus, we concluded that the alleged injury—"scientific, educational, aesthetic, recreational, spiritual, conservation, economic, and business interests" in the ongoing survival of the salmon, *id.* at 1225 (internal quotation marks omitted)—was "not too tenuously connected to the agencies' failure to reinitiate consultation," *id.* at 1229. Further, we determined that "a court order requiring the agencies to reinitiate consultation would remedy the harm asserted." *Id.*

As in *Salmon Spawning*, Cottonwood's allegation of a procedural injury relaxes its burden of showing causation and redressability. *See id.* Cottonwood need not show that reinitiation of Section 7 consultation would lead to a different result at either the programmatic or project-specific level. *See id.* Cottonwood's declarations alleging aesthetic, recreational, scientific, and spiritual injury are "not too tenuously connected to [the Forest Service's] failure to reinitiate consultation" to establish standing. *See id.* A court order reinitiating consultation on the Lynx Amendments would adequately redress the alleged harm. *See id.*

In sum, we hold that the district court properly determined that Cottonwood has standing to pursue its claim.

## IV. Ripeness

Rehashing many of its standing arguments, the Forest Service argues that Cottonwood's lawsuit is not ripe for review until, and unless, Cottonwood challenges a particular project that implements the Lynx Amendments. Further, the Forest Service suggests that adjudication of Cottonwood's programmatic challenge at this point is improper because future project-specific consultations might result in mitigation or elimination of any potential harm to Cottonwood's members, thus rendering adjudication unnecessary. We conclude, however, that Cottonwood's lawsuit is ripe for adjudication.

### A.

"The doctrine of ripeness prevents courts from becoming involved in abstract questions which have not affected the parties in a concrete way." *S. Cal. Edison Co. v. F.E.R.C.*, 770 F.2d 779, 785 (9th Cir. 1985). To determine ripeness in an agency context, we must consider:

> (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 940 (9th Cir. 2006) (applying this test to an ESA claim involving FWS). Judicial intervention does not interfere with further administrative action when an agency's decision is "at an administrative resting place." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 977 (9th Cir. 2003). Further, no additional factual development is necessary after a procedural injury has occurred. *See Ohio Forestry Ass'n*, 523 U.S. at 737 (holding that a procedural dispute is ripe "at the time the [procedural] failure takes place").

## B.

The Forest Service's arguments rest on the false premise that Cottonwood is pursuing a substantive ESA claim. As explained above, Cottonwood does not argue for a particular substantive result, but rather alleges that the Forest Service failed to comply with the procedural requirements of the ESA when it declined to reinitiate consultation. When a party such as Cottonwood suffers a procedural injury, it "may complain of that failure at the time the failure takes place, for the claim can never get riper." *Id.* at 737. The imminence of project-specific implementation "is irrelevant to the ripeness of an action raising a procedural injury." *Citizens for Better Forestry*, 341 F.3d at 977; *see also Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 703 (9th Cir. 1993). Because the alleged procedural violation—failure to reinitiate consultation—is complete, so too is the factual development necessary to adjudicate the case. *See Kraayenbrink*, 632 F.3d at 486. Further, because the Forest Service is actively applying the Lynx Amendments at the project-specific level, delayed

review would cause hardship to Cottonwood and its members.

The Forest Service's argument that judicial intervention would preclude it from refining its policies and "adopting additional protective measures" after conducting site-specific analysis misses the point. The Forest Service has completed the Lynx Amendments and refused to reinitiate Section 7 consultation after the 2009 revised critical habitat designation. That decision is ripe for review because it is "at an administrative resting place." *Citizens for Better Forestry*, 341 F.3d at 977; *see also Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006) (explaining that a claim is ripe for review when it is not "merely tentative or interlocutory," but rather the agency "has rendered its last word on the matter") *quoting Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 478 (2001). Any "additional protective measures" would apply only at the project-specific level, not the programmatic level in dispute. There is thus no improper interference with administrative action.

Delayed review would cause Cottonwood and its members further hardship. This dispute requires no additional factual development because the procedural injury has already occurred. Further, judicial intervention will not interfere with further agency action because the agency's decision is at an administrative resting place. We therefore hold that Cottonwood's claim is ripe for review.

## V. Reinitiation of Section 7 consultation

We turn to the merits of Cottonwood's argument that the Forest Service violated Section 7 of the ESA by failing to reinitiate consultation on the Lynx Amendments when FWS

designated critical habitat on National Forest land.   The Forest Service asserts that it had no remaining Section 7 obligations related to the Lynx Amendments "because the Forest Service completed its action in 2007 when it made a final decision to amend the [Forest Plans]." We disagree and hold that the Forest Service must reinitiate consultation on the Lynx Amendments.

**A.**

Under Section 7(a)(2) of the ESA,

> [e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of Commerce or the Interior] insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the critical] habitat of such species . . . .

16 U.S.C. § 1536(a)(2). If it appears that an action may affect an endangered or threatened species, the consulting agency must provide a biological opinion to the action agency explaining how the action "affects the species or its critical habitat." *Id.* § 1536(b)(3)(A). When a biological opinion concludes that the action is likely to jeopardize an endangered or threatened species, or adversely modify its habitat, then the consulting agency must suggest "reasonable and prudent alternatives." *Id.* If the biological opinion concludes otherwise, then the action is permitted to proceed.

The implementing regulations for the ESA define "action" as "all activities or programs of any kind authorized, funded, or carried out . . . by Federal agencies." 50 C.F.R. § 402.02. The regulation lists, as examples, "actions intended to conserve listed species or their habitat," *id.* § 402.02(a), and "actions directly or indirectly causing modifications to the land, water, or air," *id.* § 402.02(d). There is no dispute that the adoption of the Lynx Amendments was an action that required consultation and that the 2007 BiOp satisfied the Forest Service's initial Section 7 obligations. However, as noted above, because FWS had decided not to designate any National Forest land as critical habitat, the initial BiOp did not address, or respond to, the impact of the Lynx Amendments on designated critical habitat. The parties disagree about whether the 2009 revised critical habitat designation required reinitiation of Section 7 consultation on the Lynx Amendments.

The Forest Service argues that reinitiation was not required because it had already promulgated the Lynx Amendments and incorporated them into the Forest Plans when the FWS released its revised critical habitat designation. For support, the Forest Service relies on *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 73 (2004) ("*SUWA*"). In *SUWA*, the Supreme Court considered whether the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4370, required the U.S. Bureau of Land Management ("BLM") to supplement its environmental review of a land use plan if significant new information emerged after the plan was approved. Applying NEPA, the Court explained that "supplementation is necessary only if there remains 'major Federal action' to occur." *Id.* at 73 (citing 42 U.S.C. § 4332 and 43 C.F.R. § 1601.0-6) (internal quotation marks and alterations omitted). The Court

concluded that, because the land use plan was complete upon approval, the BLM had no obligation to supplement its environmental analysis.

In analogizing to *SUWA*, the Forest Service ignores a key difference between NEPA and the regulations governing reinitiation of consultation under the ESA. The governing ESA regulation states, in relevant part,

> [r]einitiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:
>
> . . .
>
> (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
>
> . . . , or
>
> (d) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16.[11]    Unlike the supplementation of environmental review at issue in *SUWA*, an agency's responsibility to reinitiate consultation does not terminate when the underlying action is complete.  Stated another way, there is nothing in the ESA or its implementing regulations that limits reinitiation to situations where there is "ongoing agency action."[12]    The 2009 revised critical habitat designation clearly meets the requirements of subsections (b) and (d) above.  *See id.*  The determinative question, therefore, is whether "discretionary Federal involvement or control over the [Lynx Amendments] has been retained or is authorized by law."  *See id.*

**B.**

In *National Association of Home Builders v. Defenders of Wildlife*, the Supreme Court clarified that the regulatory language limiting agencies' Section 7 obligations to actions

---

[11] The regulation governing reinitiation of consultation corresponds with the regulation governing consultation, generally.  50 C.F.R. § 402.03 ("Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control.").

[12] The parties vigorously debate whether our opinion in *Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994) is still good law after *SUWA*.  In *Pacific Rivers*, we held that the Forest Service was required to reinitiate consultation because Forest Plans are "ongoing agency action." *Id.* at 1053.  We do not address the viability of *Pacific Rivers*' reasoning after *SUWA* because it is not determinative of whether the Forest Service was required to reinitiate consultation.  We certainly agree that where there is "ongoing agency action," an agency may be required to reinitiate consultation.  However, even if the agency action is complete and not "ongoing," the agency still may be required to reinitiate consultation if there is "discretionary Federal involvement or control" over the completed action.

over which they maintain "*discretionary* Federal involvement or control" is designed to avoid "impliedly repealing nondiscretionary statutory mandates." 551 U.S. 644, 665 (2007). Section 7 does not "attach to actions . . . that an agency is *required* by statute to undertake," because it could lead to an "override" of other statutory authority. *Id.* at 669. Similarly, "[i]n the case where a permit or license ha[s] been granted, reinitiation would not be appropriate unless the permitting or licensing agency retained jurisdiction over the matter under the terms of the permit or license or as otherwise authorized by law." *Interagency Cooperation—Endangered Species Act of 1973, as Amended; Final Rule*, 51 Fed. Reg. 19926-01, 19956 (June 3, 1986); *see also  Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995) (holding that there is not sufficient discretion to warrant Section 7 consultation where an agency lacks the ability to influence a private action). In other words, if an agency has no discretion to take any action that might benefit the threatened species, Section 7 consultation would be "a meaningless exercise." *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1085 (9th Cir. 2001) ("*EPIC*") (Nelson, J. dissenting) (citing *Sierra Club*, 65 F.3d at 1509); *see also Jewell*, 749 F.3d at 784 ("The agency lacks discretion only if another legal obligation makes it impossible for the agency to exercise discretion for the protected species' benefit.").

Here, there is no "nondiscretionary statutory mandate[]," *see Home Builders*, 551 U.S. at 665, nor "legal obligation," *see Jewell*, 749 F.3d at 784, at issue that is beyond the Forest Service's authority. Reinitiation of Section 7 consultation, therefore, could yield important actionable information. The Forest Service remains "involve[d]" in the Forest Plans, 50 C.F.R. § 402.16, because, as *SUWA* itself explained, agencies make additional decisions after approval that implement land

use plans at the site-specific level, *see* 542 U.S. at 69–70. Further, the Forest Service retains exclusive "control," 50 C.F.R. § 402.16, over its own Forest Plans throughout their implementation. Indeed, we have repeatedly explained that Forest Plans fall squarely within the "discretionary" parameters of 50 C.F.R. §§ 402.03 and 402.16 because, through the Forest Plans, the Forest Service retains a "continuing ability . . . to control forest management projects . . . ." *Sierra Club*, 65 F.3d at 1509; *see also W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1110 (9th Cir. 2006) (explaining our holding in *Pacific Rivers Council*, 30 F.3d at 1053–54, that Section 7 applies to Forest Plans, because the Forest Service "maintain[s] continuing authority"); *EPIC*, 255 F.3d at 1080.

## C.

This is not the first time since *SUWA* that we have decided that an agency has obligations under Section 7 even after the underlying action is complete. In *Washington Toxics Coalition v. Environmental Protection Agency*, 413 F.3d 1024 (9th Cir. 2005), the Environmental Protection Agency ("EPA") argued that, because it had completed registration of fifty-four pesticides pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136 *et seq*., it was not required to comply with Section 7. 413 F.3d at 1030–33. Rejecting that argument, we clarified that the appropriate test is not whether the agency has completed its action, but whether it retains regulatory authority over the action. *Id.* at 1033. We concluded that "[b]ecause EPA has continuing authority over pesticide regulation, it has a continuing obligation to follow the requirements of the ESA." *Id.* We explained that it was EPA's discretion to take actions

that "inure to the benefit" of protected species that placed the registrations within the ambit of Section 7. *Id.*

As in *Washington Toxics*, it is irrelevant here whether the process of incorporating the Lynx Amendments into the Forest Plans was complete when FWS designated lynx critical habitat on National Forest land. "Because [the Forest Service] has continuing authority over [the Lynx Amendments to the Forest Plans], it has a continuing obligation to follow the requirements of the ESA." *See id*. The Forest Service's "ongoing regulatory authority" provides it "discretionary control to inure to the benefit of [the Canada lynx]." *See id.* (internal quotation marks omitted). Indeed, the Forest Service's decision to voluntarily reinitiate consultation in some forests, but not in others, demonstrates that it retains discretion and authority over the Lynx Amendments, and that it does not view reinitiation of consultation as a meaningless exercise.

Requiring reinitiation in these circumstances comports with the ESA's statutory command that agencies consult to ensure the "*continued* existence" of listed species. 16 U.S.C. § 1536(a)(2), (4) (emphasis added). The Forest Service's position in this case would relegate the ESA—"the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978)—to a static law that evaluates and responds to the impact of an action before that action takes place, but does not provide for any further evaluation or response when new information emerges that is critical to the evaluation. Here, FWS discovered that its decision on critical habitat had been tainted by an ethical lapse in its own administrative ranks. Re-evaluation of the data generated a drastically different result that justified vast

designation of previously unprotected critical habitat. These new protections triggered new obligations. The Forest Service cannot evade its obligations by relying on an analysis it completed before the protections were put in place.

We hold that, pursuant to the ESA's implementing regulations, the Forest Service was required to reinitiate consultation when the FWS designated critical habitat in National Forests. We therefore affirm the district court ruling on this issue.

## VI. Injunctive relief

In its cross-appeal, Cottonwood argues that the district court erred when it declined to enjoin "those projects that 'may affect' critical habitat" until the agency has completed the required Section 7 consultation. Cottonwood contends that the court improperly required that it present evidence showing a likelihood of irreparable injury. Cottonwood urges the court to follow our nearly thirty-year-old precedent that relieves plaintiffs of the traditional burden of establishing irreparable harm when seeking injunctive relief to remedy a procedural violation of the ESA. We affirm the district court's denial of injunctive relief but remand for further proceedings.

## A.

Under "well-established principles of equity," a plaintiff seeking permanent injunctive relief must satisfy a four-factor test by showing:

> (1) that it has suffered an irreparable injury;
> (2) that remedies available at law, such as

monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Starting with *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985), we have long recognized an exception to the traditional test for injunctive relief when addressing procedural violations under the ESA. *See also Wash. Toxics*, 413 F.3d at 1035; *Sierra Club v. Marsh*, 816 F.2d 1376, 1384 (9th Cir. 1987). In *Thomas*, after holding that plaintiffs established a procedural violation of the ESA, we addressed the appropriate remedy. We looked to our case law under NEPA, noting that "[t]he procedural requirements of the ESA are analogous to those of NEPA. . . ." 753 F.2d at 764. We then acknowledged in the NEPA context, we had held that because "[i]rreparable damage is presumed to flow from a failure properly to evaluate" environmental impacts of an agency action, an injunction is typically the appropriate remedy for a Section 7 violation.[13]   *Id.* (citing *Save Our*

---

[13] In a subsequent case involving a Section 9 illegal take claim, *National Wildlife Federation v. Burlington Northern Railroad*, we held that, although the traditional test for injunctive relief does not apply in ESA cases, "[t]he plaintiff must make a showing that a violation of the ESA is at least likely in the future." 23 F.3d 1508, 1511 (9th Cir. 1994). In that case, it was undisputed that there had been a take of animals within an endangered species, grizzly bears, but we affirmed the denial of injunctive relief because there was insufficient evidence in the record that the

*Ecosystems v. Clark*, 747 F.2d 1240, 1250 (9th Cir. 1984); *Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 330 (9th Cir. 1975)). Critical to our discussion here was our holding that "[w]e see no reason that the same principle should not apply to procedural violations of the ESA." *Id.* In so holding, we explained that "[i]t is not the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed." *Id.* at 765.

In 2005, we reiterated that "the appropriate remedy for violations of the ESA consultation requirements is an injunction pending compliance with the ESA." *Wash. Toxics*, 413 F.3d at 1035. We acknowledged that some "non-jeopardizing agency actions [may] continue during the consultation process," but stated that "the burden should be on the agency [as] the entity that has violated its statutory duty" to establish that the agency action is non-jeopardizing. *Id.*

The Forest Service argues that the *Thomas* presumption of irreparable harm has been effectively overruled by two recent Supreme Court cases addressing injunctive relief in the context of NEPA: *Winter v. Natural Resources Defense*

---

defendant's operations would result in a future take of bears. On the surface, there is some tension between *Burlington* and *Thomas*, but there is a fundamental difference between the two cases. *Burlington* involved a discrete incident that resulted in a substantive violation of the ESA, whereas *Thomas* involved a procedural violation. Addressing the procedural aspects of the ESA, we stressed in *Thomas* that there is a presumption of irreparable harm because "there can be no assurance that a violation of the ESA's substantive provisions will not result" from a procedural failure under Section 7. 753 F.2d at 764. Notably, there was no procedural violation at issue in *Burlington*.

*Council, Inc.*, 555 U.S. 7 (2008), and *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). In *Winter*, the Court rejected our test for preliminary injunctive relief in NEPA cases as "too lenient." 555 U.S. at 22. Our precedent had allowed for granting a preliminary injunction upon a showing that irreparable harm was a "possibility." *Id.* The *Winter* Court held that, even in NEPA cases, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* In *Monsanto*, this time addressing permanent injunctive relief in the context of NEPA, the Court disapproved of cases which do not apply the traditional four-factor test and instead "presume that an injunction is the proper remedy for a NEPA violation except in unusual circumstances." 561 U.S. at 157. The Court explained that there is nothing in NEPA that allows courts considering injunctive relief to put their "thumb on the scales." *Id.*

### B.

The central question here is whether *Winter* and *Monsanto*'s analysis of injunctive relief under NEPA extends to the ESA, or whether the differences between the two statutes warrant a different test. The Supreme Court has explained that

> Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full

scope of that jurisdiction is to be recognized
and applied.

*Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987) ("*Amoco*") (internal quotation marks and alterations omitted); *see also eBay*, 547 U.S. at 391–92 (rejecting a presumption in favor of injunctive relief because "[n]othing in the Patent Act indicates that Congress intended such a departure [from the traditional four-factor test]. To the contrary, the Patent Act expressly provides that injunctions 'may' issue 'in accordance with the principles of equity'" (citing 35 U.S.C. § 283)). Therefore, we must look to the underlying statute to determine whether the traditional test for injunctive relief applies, or whether courts must apply a different test.

There is no question, as firmly recognized by the Supreme Court, that the ESA strips courts of at least some of their equitable discretion in determining whether injunctive relief is warranted. *Amoco*, 480 U.S. at 543 n.9 (explaining that the ESA "foreclose[s] the traditional discretion possessed by an equity court"). *Hill* held that courts do not have discretion to balance the parties' competing interests in ESA cases because Congress "afford[ed] first priority to the declared national policy of saving endangered species." 437 U.S. at 185. *Hill* also held that Congress established an unparalleled public interest in the "incalculable" value of preserving endangered species. *Id.* at 187–88. It is the incalculability of the injury that renders the "remedies available at law, such as monetary damages . . . inadequate." *See eBay*, 547 U.S. at 391; *see also Amoco*, 480 U.S. at 545 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages . . . ."); *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999 (9th Cir. 2009) (same). But, although *Hill* clarified that

the "language, history, and structure" of the ESA, 437 U.S. at 174, remove several factors in the four-factor test from a court's equitable jurisdiction, *Hill* did not resolve whether plaintiffs must establish irreparable injury. That factor was not an issue in *Hill* because there was uncontroverted scientific evidence that completion and operation of the disputed project would "either eradicate the known population of [the listed species] or destroy their critical habitat." *Id.* at 171.

There is nothing in the ESA that explicitly, "or by a necessary and inescapable inference," restricts a court's discretion to decide whether a plaintiff has suffered irreparable injury. *See Amoco*, 480 U.S. at 542 (internal quotation marks omitted); 16 U.S.C. § 1540(g)(1)(A). Although Congress altered the third and fourth prongs of the traditional four-factor test for injunctive relief in ESA cases, *Hill*, 437 U.S. at 185, 187, and the second is generally not at issue in environmental cases, *Amoco*, 480 U.S. at 545, the ESA does not allow courts to put their "thumb on the scales" in evaluating the first prong, *Monsanto*, 561 U.S. at 157. Thus, even though *Winter* and *Monsanto* address NEPA, not the ESA, they nonetheless undermine the theoretical foundation for our prior rulings on injunctive relief in *Thomas* and its progeny. Indeed, *Thomas*'s reasoning explicitly relied on the presumption of irreparable injury that we had previously recognized in the NEPA context.[14]   Where

---

[14] Cottonwood argues that since *Winter* and *Monsanto* we have continued to apply *Thomas*'s presumption of irreparable harm, citing *Kraayenbrink*, 632 F.3d at 500, and *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 533 (9th Cir. 2010). Although we determined in both cases that the ESA procedural violation warranted injunctive relief pending compliance with the ESA, we did so without discussing *Winter* and *Monsanto*'s impact on *Thomas'*s presumption of irreparable harm.

Supreme Court precedent "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable," the prior circuit precedent is no longer binding. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). We must therefore conclude that there is no presumption of irreparable injury where there has been a procedural violation in ESA cases. A plaintiff must show irreparable injury to justify injunctive relief. In light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them, establishing irreparable injury should not be an onerous task for plaintiffs. 16 U.S.C. § 1531.

## C.

The dissent worries that our opinion today will cause "uncertainty" "as a global storm of extinction rages." Dissent at 40. The dissent overstates the significance of our holding. First, our opinion does nothing to disturb the Supreme Court's holding in *Hill* that when evaluating a request for injunctive relief to remedy an ESA procedural violation, the equities and public interest factors always tip in favor of the protected species. As the Court made unmistakably clear: "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" *Hill*, 437 U.S. at 194. That fundamental principle remains intact and will continue to guide district courts when confronted with requests for injunctive relief in ESA cases.

Second, we do not dispute that the *Thomas* presumption of irreparable harm virtually assures the grant of injunctive

relief to remedy an ESA procedural violation.  But that does not mean that without the aid of such a presumption the district courts will be at a disadvantage in remedying procedural violations pending compliance with the ESA. Indeed, as exemplified by several of the cases the dissent cites, district courts are quite capable of identifying harm to protected species, and in crafting an injunction to remedy the precise harm.  For instance, in *South Yuba River Citizens League v. National Marine Fisheries Service*, the district court, although acknowledging *Thomas*'s holding, nonetheless held that the plaintiff "must show that irreparable harm to the listed species will result from defendants' violation of the ESA in the absence of each [protective] measure plaintiffs request."  804 F. Supp. 2d 1045, 1054 (E.D. Cal. 2011).  The court proceeded to address the evidence of harm and the relief requested, and granted an injunction to address the harm established by the evidence.

Similarly, in *National Wildlife Federation v. National Marine Fisheries Service*, 839 F. Supp. 2d 1117, 1131 (D. Or. 2011), the plaintiffs moved the district court to order the operators of the Federal Columbia River Power System to maintain previously established spring and summer dam spills along the Columbia River for the protection of endangered salmon species.  In ruling on the motion, the court recognized our holding in *Thomas*, but did not stop there.  Instead, it proceeded to review the record and found that without certain protective measures sought by the plaintiffs, including the spills, the protected fish would suffer irreparable harm.  The court then granted injunctive relief to address the specific harm.

As these cases demonstrate, district courts will not be left adrift without the benefit of *Thomas*'s presumption of

irreparable harm. The purposes and objectives of the ESA, as recognized in *Hill*, will continue to provide fundamental direction to the district courts when confronted with a request for injunctive relief to remedy a procedural violation of the ESA. The presumption of irreparable harm, however, as explained above, cannot survive the Court's recent opinions in *Winter* and *Monsanto*.

## D.

Although we acknowledge today that *Thomas*'s ruling on injunctive relief is no longer good law, we recognize that it has been the law of the circuit since 1985. Cottonwood should not be faulted for relying on *Thomas* and its progeny as a basis for injunctive relief. We therefore vacate the district court's denial of injunctive relief and remand on an open record to allow Cottonwood an opportunity to make a showing of irreparable injury.

## VII. Conclusion

We affirm the district court's ruling that the Forest Service violated Section 7 of the ESA when it failed to reinitiate consultation after FWS designated critical habitat on National Forest land. We also affirm the district court's denial of injunctive relief to Cottonwood. We remand, however, to provide Cottonwood an opportunity to make an evidentiary showing that specific projects will likely cause irreparable damage to its members' interests.

**AFFIRMED AND REMANDED.**

The parties shall bear their own costs on appeal.

PREGERSON, Circuit Judge, concurring in part and dissenting in part:

Respectfully, I dissent from Section VI of the majority opinion which makes it harder to protect the threatened Canada Lynx and its critical habitat, and puts the species at increased risk. I do not agree with the majority that *Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985) ("*Thomas*"), should be put into the shredder by inferring that *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), and *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010), implicitly "undermine the theoretical foundation for our prior rulings on injunctive relief in *Thomas* and its progeny." Maj. op. at 33. I do not read *Winter* and *Monsanto* as casting a dark shadow on the ESA's legislative purpose and our Ninth Circuit precedent. *Winter* and *Monsanto* are not "clearly irreconcilable" with *Thomas* as required for a three-judge panel to overturn settled Ninth Circuit case law. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003).

*Winter* and *Monsanto* focus on NEPA's—not the ESA's—standard for injunctive relief. *Winter* and *Monsanto* do not address the ESA, which has a unique purpose and history, and still shines as the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Babbitt v. Sweet Home Chapter of Cmtys for a Great Oregon*, 515 U.S. 687, 698 (1995).

The Supreme Court has carefully considered the ESA's purpose and text in terms of a court's equitable powers when faced with an ESA violation. *See TVA v. Hill*, 437 U.S. 153, 173, 193–95 (1978) (finding that it was the plain intent of Congress in enacting the ESA to halt and reverse the trend towards species extinction, whatever the cost, and that an

injunction was the appropriate remedy when a nearly-completed, multimillion-dollar dam threatened an endangered snail darter and its critical habitat).

The Supreme Court examined congressional intent to understand how Section 7 of the ESA affected the courts' equitable powers. *Id.* at 183–84. Although the courts ensure compliance with the ESA, as the Supreme Court noted, "Congress had foreclosed the exercise of the usual discretion possessed by a court of equity." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Discussing *Hill*, the Ninth Circuit has observed that "[courts] have no expert knowledge on the subject of endangered species, much less do [they] have a mandate from the people to strike a balance of equities [against the interests of an endangered species]." *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987) (internal citations omitted).

The majority asserts that "the ESA does not allow courts to put their thumb on the scales," Maj. op. at 33. But, I remain firmly convinced that "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities . . . ." *Sierra Club*, 816 F.2d at 1383. I agree with the Supreme Court that "[o]ne would be hard pressed to find a statutory provision whose terms were any plainer than [those of the ESA]." *Romero-Barcelo*, 456 U.S at 313 (*citing Hill*, U.S. 437 at 173).

The ESA commands federal agencies to "insure that any action authorized, funded, or carried out by [them] is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species

. . . ." 16 U.S.C.A. § 1536.  "The purpose and language of the statute under consideration in *Hill*, not the bare fact of a statutory violation, compel[ an injunction in the face of an ESA violation that threatens critical habitat]." *Romero-Barcelo*, 456 U.S. at 314.  "In Congress's view, projects that jeopardized the continued existence of endangered species threatened incalculable harm: accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species." *Sierra Club*, 816 F.2d at 1383. Contrary to the majority, I agree with Ninth Circuit precedent holding that "[w]e may not use equity's scales to strike a different balance." *Id*.

The majority's analogy between NEPA and the ESA fails to appreciate the critical difference between these statutes. The ESA's statutory goal is to substantively provide for the conservation of endangered and threatened species and their ecosystems, 16 U.S.C.A. § 1531(b); whereas NEPA's statutory goals are fundamentally procedural, and designed to create an environmental policy process that promotes the nation's general welfare.  42 U.S.C. § 4331; *see Winter*, 555 U.S. at 23 (remarking that "NEPA itself does not mandate particular results.  Instead, NEPA imposes only procedural requirements to ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." (internal citation and quotation marks omitted)).

The substantive purpose of the ESA, conserving endangered and threatened species and their ecosystems, justifies more protective processes than NEPA's purpose, ensuring decision-makers have and consider all important information on environmental impacts.  *See Thomas*,

753 F.2d at 764 ("If anything, the strict substantive provisions of the ESA justify *more* stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions.").

It is important to note that the majority opinion eliminates *Thomas*'s procedural protections as a global storm of extinction rages. *See* S.L Pimms et al., *The Biodiversity of Species and Their Rates of Extinction, Distribution, and Protection*, 344 Science 1246752 (2014) (concluding that rates of extinction today are approximately 1,000 times the rate of extinction absent human action); Elizabeth Kolbert, *The Sixth Extinction: An Unnatural History* (2014). The uncertainty resulting from the majority opinion bodes ill for endangered species and the public.

A number of species at risk of extinction have been protected by *Thomas*'s holding, *both in the Ninth Circuit and elsewhere. See*, *e.g.*, *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 804 F. Supp. 2d 1045, 1055 (E.D. Cal. 2011) (protecting Chinook salmon, Central Valley Steelhead, and green sturgeon); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 820 F. Supp. 2d 1029, 1038 (D. Ariz. 2011) (protecting the Mexican spotted owl and New Mexico ridge-nosed rattlesnake); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1131 (D. Or. 2011) (protecting several endangered species of salmon, including Chum, Chinook, Sockeye, and Coho salmon); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, No. C 03-05509 SI, 2004 WL 3030209, at *6 (N.D. Cal. Dec. 30, 2004) (protecting the Mojave desert tortoise); *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 138 F. Supp. 2d 1228, 1248 (N.D. Cal. 2001) (protecting the

shortnose sucker and the Lost River sucker); *Greenpeace v. Nat'l Marine Fisheries Serv.*, 106 F. Supp. 2d 1066, 1073 (W.D. Wash. 2000) (protecting the Stellar sea lion); *Greenpeace Found. v. Mineta*, 122 F. Supp. 2d 1123, 1137 (D. Haw. 2000) (protecting the Hawaiian monk seal); *Florida Key Deer v. Brown*, 386 F. Supp. 2d 1281, 1291 (S.D. Fla. 2005), *aff'd sub nom. Florida Key Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008) (protecting the Key Largo cotton mouse, Key Deer, Key Largo woodrat, Lower Keys marsh rabbit, Schaus' swallowtail butterfly, silver rice rat, Stock Island tree snail, and Key tree-cactus).

Section VI of the majority opinion states that "[i]n light of the stated purposes of the ESA . . .[,] establishing irreparable injury should not be an onerous task for plaintiffs." Maj. op. at 34. This may prove more difficult in practice than the majority assumes.

The majority opinion points to *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117 (D. Or. 2011), where a district court seemingly easily identified irreparable harm to endangered salmon species, to demonstrate that district courts will have no difficulty determining the existence of irreparable harm to a species and tailoring injunctions accordingly. Maj. op. at 35–36. Notably, the majority opinion fails to discuss the decades of scientific analysis needed for the district court to identify that harm, beginning with the 1991 listing of the Snake River sockeye salmon as an endangered species under the ESA. *See*, *e.g.*, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 2005 WL 1278878, at *22–32 (D. Or. May 26, 2005) (listing some of the scientific sources considered by the District Court of Oregon during *National Wildlife Federation*'s years of protracted litigation)). A full review of the "Columbia

basin salmon saga" demonstrates that the district court's decades-long efforts to analyze the evidence of irreparable harm has resulted in judicial frustration and "status quo dam operations [that] largely continue to inflict high salmon mortalities" even "over two decades after a determination that more than a dozen species of Pacific salmonids require ESA protection." Michael C. Blumm & Aurora Paulsen, *The Role of the Judge in ESA Implementation: District Judge James Redden and the Columbia Basin Salmon Saga*, 32 Stan. Envtl. L.J. 87, 148 (2013) (examining a "paradigmatic example of the limits of judicial review to effectuate real improvements in complex natural resources cases" despite active managerial efforts by the district court).

The outcome of *National Wildlife Federation* is a good example justifying *Thomas*'s holding that an injunction to protect endangered species and their critical habitat must come first.[1]    *Thomas*'s holding remains one of the best

---

[1] The majority opinion also discusses *South Yuba River Citizens League*, 804 F. Supp. 2d 1045, another ESA case involving the effect of dams on endangered salmon and other fish species, to demonstrate the ability of a district court to "address the evidence of harm and the relief requested, and grant[] an injunction to address the harm established by the evidence." Maj. op. at 35.

But a careful reading of *South Yuba River* finds that *Thomas* provided a critical function in that case, offering the district court a solid foundation for an injunction even when the "data and analysis necessary to determine what measures, precisely, are needed in order to avoid jeopardizing the listed species [were not provided by the government.]" 804 F. Supp. 2d at 1055. Lacking this necessary information, the district court was able to "err on the side of a more protective injunction," relying, in part, on *Thomas*'s holding that, had plaintiffs sought such a remedy, the court could "enjoin the new project entirely." *Id*.

guarantors of positive outcomes for threatened and endangered species.

Because I would follow settled precedent and protect the Canada Lynx and its critical habitat first, I would apply *Thomas v. Peterson* rather than finding it to be implicitly overturned as the majority does.  Thus, I would grant Appellant's request for an injunction pending compliance with the ESA's Section 7 consultation requirements.